White, Special J.
delivered the opinion of the court.
The original bill in the first cause, states, that on the 22d of October 1818, the defendant, Christopher, drew a hill of exchange on Stump, Eastland and Cox, at New Orleans, in favor of defendant Thomas H. for $8,200, payable one hundred and eighty days after date, which hill was accepted by the drawees, hut not paid, and endorsed by the said Thomas H. to the complainants. The drawees, about that time, became insolvent. The defendant Christopher becoming embarrassed, agreed to place a certain note for $8,000, of which he was the holder and owner, executed by S. & L. P. Gustine to W. C. Middleton, all of the State of Mississippi, and by the latter endorsed to the said Christopher, dated the 8th January, 1819, due the first March 1820, in the hands of the defendant John, as trustee, to remain there as collateral security that said bill should be paid by Christopher, the debtor, to the complainants. And said defendants agreed that said note should not be withdrawn, by either of them, until the hill was paid. Said *259 John at the same time, signed a receipt, in the following words: “Received of C. Stump a note due the 1st March 1820, signed Samuel Gustine and Lemuel P. Gustine, endorsed by William C. Middleton for ‡8000, which note is placed in my hands for the following purpose, to wit: whereas Thomas H. Fletcher is endorser on my draft on a house in New-Orleans for $¡8,200, which draft has been protested, and Thomas H. Fletcher has been sued in Orleans as endorser on said draft; now the above note for $>8000, is placed in my hands as collateral security to secure the said Fletcher against loss as endorser on said draft: if said Fletcher pays the above draft, I am to deliver him the above note.
JOHN SOMMER VILLE, Cashier.
Before either of the parties can receive the above note, the protested draft above mentioned must be produced, or satisfactory evidence of the party demanding the note having made the payment.
JOHN SOMMERVILLE, Cash’r”
The drawer and endorser were duly notified of the non-payment of the bill, although the drawees had no effects of the said Christopher in their hands. A suit was brought in New-Orleans in the Parish Court against Fletcher as endorser. Verdict and judgment were recovered against him, but the judgment was afterwards reversed in a superior court for want of jurisdiction in the parish court, and for that cause alone, which was by mistake of counsel. Fletcher and Stump have since become insolvent. The prayer is, that they may have the benefit of said collateral security.
The answer of Christopher Stump admits the drawing and endorsing of the bill, its non-payment at maturity, and its endorsement by Fletcher; denies that he deposited the note upon the Gustines, with Mr Sommer-ville, to secure complainants in the payment of their bill of exchange; but that it was deposited with Som-merville by him, for the benefit of Thomas H. Fletcher, *260 and to secure .him against the endorsement of said hill. a|j0U^ ⅛6 §⅛ January 1819, Joshua Cox sold defendant a number of negroes, for twenty odd thousand dollars, near Natchez, gave Cox his note, payable at Nashville in a few months thereafter for the purchase money, which being unpaid, Cox brought suit against them, in the Davidson county court. That John Cat-ron was Cox’s agent as well as attorney at law, to attend to the business and to make any arrangement in the settlement of it. Respondent sold said negroes at a considerable profit, immediately after they were purchased from Cox, and to secure the payment of the purchase money, got several notes upon Samuel and Lemuel' P. Gustine, executed to W. C. Middleton, and endorsed by him to respondent, the $8000 note in dispute being one of the number. Respondent had received these notes for the negroes, and paid said Cox fifteen or sixteen thousand dollars in the paper of the Gustines, leaving between five and six thousand dollars unpaid, which he promised to pay with the above eight thousand dollar note, as soon as he could get the same. He stated the situation of the note to Mr. Catron, who as agent of Cox, thought that no recovery could be had against Fletcher upon the bill of exchange, and that respondent could get and transfer the note to Cox, and agreed to take the note in discharge of the balance of Cox’s debt, after paying John C. M’Lcmore seven hundred dollars as assignee of Mr. Fletcher, being money expended in the suit at New-Orleans, and the balance of the note said Stump agreed to pay said Catron for debts he owed him for attending to his business as counsel. Respondent states it was shortly after the note was pledged, that he sold the same to Mr. Catron, for Cox and himself; and he was indulged upon his own notes in consequence of it, until filing of complainants’ bill. Respondent further states, that he paid Joshua Cox about four thousand dollars, in a tract of land, lying on the *261 Mississippi near Point Coupee, and that the title to the i i , , . r, . . , . , same had become detective, by which means it was lost to Gox, and he then owed him largely upwards of eight thousand dollars; denies that the note was deposited for the benefit of Breedlove & Co. The answer of Fletcher admits the drawing of the bill by Stump, his endorsement, and that at maturity it was protested for nonpayment. Complainants brought suit against him in New-Orleans,by attachment, upon the bill of exchange. He applied to Stump for indemnity, who being much • embarrassed, agreed to place the note in dispute in the hands of John Sommerville, to secure respondent against loss by said endorsement, and for his indemnity. Respondent being insolvent, but wishing to save his securities upon the attachment at New-Qrleans, wrote to complainants, and offered them the note in dispute, provided they would withdraw the suit at Orleans and wholly release respondent and his friends from liability, which they declined. Respondent denies that the note was placed in the hands of Sommerville for the benefit of complainants; he was only mindful of his own interest and that of his securities in the suit at Orleans. Respondent having succeeded in the suit at New-Orleans, was willing to deliver saidj note to Stump, when he would pay respondent seven hundred dollars which he had expended in that suit, and which claim he had transferred to M’Lemore. Deposite was made with Sommerville as a private individual; avers that at the time of the de-posite, Sommerville did not deliver to him any receipt for the note; says the demand was made of Sommer-ville, by Catron, himself and M’Lemore, on the 19th of August 1820. Sommerville’s answer is substantially the same with his deposition in the cause, which will be noticed hereafter. On the 1st. of September 1820, a bill purporting to be a cross bill, was filed by Joshua Cox, John Catron and JohnC. M’Lemore, against John Sommerville, Christopher Stump and Thomas H. Fletch *262 er. The object of which bill (without going into any detail) is to have the benefit of said note to satisfy their respective debts, by virtue of an agreement with Stamp to that effect after the note was deposited with Sommer-ville, Fletcher agreeing to the same, upon the payment of seven hundred dollars to M’Lemore, the amount of the expenses he had incurred in defending the suit at New-Orleans.
On the 4th of March 1823, an amended and supplemental bill was filed by John Cox and the other complainants, against the same defendants, setting up a new and entirely distinct ground of equity, alleging that the note now in controversy, with two others of the same amount, upon the same persons, was delivered over to Cox by Stump in the spring of 1819, to be held by Cox as collateral security for the purchase money of some negroes, sold by Cox to Stump about that time, or a few days preceding; which purchase money amounted to about f>24,900. The bill states, that about the time of the deposite with Cox, these notes together with ‡200 in cash, were fraudulently taken out of the pocket book of the said Cox, by the said Stump at Natchez, he, the said Joshua, having entrusted him with his pocket book to carry to the Bank for safe keepinj|, while he was laboring under indisposition. The complainant Cox, insists that he alone is entitled to the whole of the ‡8,000 note in the hands of the receiver of the court.
I will now proceed to examine this cause, in the first place, with reference to the parties in the first bill. It will be remembered that this was peculiarly the debt of Stump; that Fletcher was an accommodation endorser, and that the complainants are the holders of the bill.— Now suppose the fact to be, as established by the defendants in their answers, that this note was deposited with Sommervilleto secure Fletcher against loss, in'consequence of his endorsement of the draft, and for his indemnity, and that Breedlove, Bradford and Robeson *263 were not contemplated in the arrangement; is it not a principle of natural equity, as well as positive law, that the funds of the debtor shall be applied to the payment of his debts, and would not a court of equity, under such circumstances, create and enforce the trust in favor of complainants? Such seems to be the intimation of the court, in 7th Cranch, 97. They say, “it is settled in this court, that the person for whose benefit a trust is created, who is to be the ultimate receiver of money, may sustain a suit in equity, to have it paid directly to himself.” In this case, it must be apparent, that although the note was deposited with Sommerville, for Fletcher’s indemnity on account of the draft, it was not that he might receive the money, and apply it to his own individual use; but to the payment of the bill, of which he was the endorser, and, that consequently, the complainants were to be the ultimate receivers of the money. In first Equity Cases, Abridged, 93, we find the law laid down in these words: “A bond creditor shall, in this court, have the benefit of all counter bonds, or collateral security, given by the principal to the surety; as if A owes B money, and he and C are bound for it, and A gives C a mortgage or bond to indemnify him, B shall have the benefit of it to recover his debts.” In 11 Vesey, 22, the master of the Rolls recognizes the principle, that the creditor is entitled to the benefit of all the securities the principal debtor has given to his surety, and that the surety has an equity to the benefit of all the securities the principal gives to the creditor. Questions of this character have frequently come before the courts of the State of New-York, where the principles of the commercial law, as well as the law of lien, have been expounded with as much ability and learning, as by any other tribunals; and the current of authority there, is believed to be uniform. In the case of Moses vs. Murgatroyd, 1 John. Ch. Rep. 119, Moses was the holder of notes to a considerable amount, executed by *264 Ogden, and endorsed by Murgatroyd; to secure the en-^orger^ Qgdenthe maker, had assigned him certain securities as an indemnity; and the object of the bill was to have the benefit of that indemnity. Chancellor Kent (clarum ct venerabile nomen) in giving his opinion, says, “The plaintiffs, as holders of the notes, are entitled to the benefit of this collateral security, given by their principal debtor to his surety. These collateral securities are, in fact, trusts created for the better protection of. the debt; and it is the duty of this court to see that they fulfil the design. And whether the plaintiffs were apprized, at the time, of the creation of the security, is not material. The trust was created for their benefit, or for the better security of the debt, and when it came to their knowledge, they were entitled to affirm the trust, and to enforce its performance.” To the same cifect, are the cases of Neilson vs. Blight, 1 John. Ca. 205; Phillips vs. Thompson, 2 John. Ch. Rep. 418; and Shepherd vs. M’Evers, 4 John. Ch. 136.
But it is time to look at the proof upon this point of the cause. John Sommerville in his deposition states, that some time prior to the month of February 1820, Stump and Fletcher both being present, handed him the note mentioned in the bill and answers, with a receipt prepared for him to sign for the deposite of said note, (which receipt is copied in the statement of the case,) to which receipt he affixed his signature. That in addition to the instructions contained in the receipt, the parties stated that neither of them was to have possession of the note, until the conditions were truly complied with. That under these instructions, he received and held the note, sealed it in an envelope, and sent it to the State of Mississippi for collection. When said note was deposited with him, it was endorsed by Stump in blank; but when he forwarded it for collection, he wrote a special endorsement to himself as Cashier, over his name, to enable him to collect it, and to apply the same *265 according to his instructions. The evidence of Mr. Fletcher, a gentleman of equal respectability, is not deemed materially discrepant from that of Sommer-ville. lie only says, he does not recollect that Mr. Som-merville gave any receipt for this note; his impression is, that he made a memorandum about the terms of the de-posite, which he filed away with the note. It is believed then, that the court may with safety regard the paper or memorandum, which was made at the time, and contained the terms upon which the note was transferred and delivered to Sommerville, as furnishing better evidence than the memory of any witness. This memorandum, after reciting that Fletcher had been sued at New-Orleans, as endorser of the draft, goes on to say, that the note now in controversy was placed in the hands of Sommerville, as collateral security, to secure Fletcher against loss as endorser on said draft, and that he was to deliver the note to either party who paid the draft. There is this further proviso; that before either of the parties can receive the note, he must produce the draft, or give satisfactory evidence of having paid it. What, I would ask, is the plain and obvious meaning of this paper? Is it not primarily indeed, to indemnify Fletcher, and likewise to provide a fund to secure the payment of the draft1! Any other construction would render that clause inoperative, which says, that neither party, shall have the note until he pays the draft; and likewise involve the absurdity, against the words which are used, that Fletcher might receive the money, and ap. ply it to his own individual use; the very event which Stump intended to provide against, in consequence of the embarrassed situation of Fletcher. Mr. Fletcher, to be sure, says, that it was intended for his own indem. ¡¡ nity; *but that is perfectly consistent with the idea here „ advanced; for that object would be best effected, by" providing a fund for the payment of the bill, upon which he admits himself to be responsible; but if the *266 meaning were in any respect doubtful, the parties themselves have placed a construction upon the instrument, by their acts as well as words, which I do not feel at li~ berty to disregard. On the 10th of April, 1820, but a. short time after the note had been deposited with Som-merville, Christopher Stump writes to Breedlove, Bradford and Robeson about this note, which, in the interval, had been sent to tbe lower country for collection. He uses language like this: that this note was for the use of, and to be applied by Sommerville, when collected, to the payment of the draft drawn by him on Stump, East-land and Cox, which had been protested," and upon which Fletcher was endorser; that this note was placed in the hands of Fletcher to secure him as his endorser; and adds, I hope you will procure an attorney to attend to the business; the interest lies in you, and I hope you will secure the same. We find Fletcher likewise writing to them in reference to the same fund, but offering it to them upon the terms, that they would receive it in absolute discharge of their debt. Can it be doubted then, so far at all events as Stump is concerned, (and Fletcher if he* is indemnified, cannot complain',)-that he intended at the time of the transfer and deposite with Sommerville, that Breedlove, Bradford and Robeson should have the beneficial interest of the note, to secure the payment of the debt; and consequently the argument of the counsel for the appellants, founded upon the assumption that this was merely a conditional de-posite, to abide the event of the suit against Fletcher in New-Orleans, falls to the ground.' This idea is repudiated by Fletcher, when he says, that if he had continued in solvent circumstances, he should still have claimed his lien upon the note.
But it is argued, that complainants did not make their election to accept this trust. I am of opinion, that the trust being for their benefit, the law will presume an acceptance. The filing of this bill, however, which was *267 upon the 19th of August 1820, soon after Robeson came to Nashville, is an express act of affirmation. They lived in New-Orleans, and cannot be considered guilty of any unreasonable delay in asserting their rights. In the case of Shepherd vs. M’Evers, before referred to, 4 John. Ch. 136, a conveyance was made on the eighth of June 1807, to trustees, for the purpose, among other things, of securing a debt due to a house in England, but without the knowledge of that house. On the 9th October 1807, another trust was created upon the pro. perty,bythe debtor, with the assent of the first trustee. In June 1816, a bill was filed to have the second conveyance 'set aside, and to make the property chargeable with the trust contained in the first deed. It does not appear from the report of the case, that the first cestui que trust did any act of affirmance before the filing of his bill; yet the court sustained the first' trust, the grantees in the second deed having knowledge of that trust.
Another objection is taken, that there should be a judgment at law against Flctclier and Stump, before the complainants can come into this court. The distinction in answer to it, has been well taken at the bar; that a judgment at law is only necessary where a court of equity acts as auxiliary to a court of law, but not where it acts by virtue of its original, exclusive, and substan. tive powers, as in cases of trusts; then, the trust is the equity, and it is the duty of the court to see that it is properly executed. The case in 1 John. Rep. 119, is one where there was no judgment at law. If this court could'not interfere, without a judgment at law, the trust fund might be' dissipated, and the party left without any relief. In this case, Stump admits his liability. Fletcher in his deposition says, that he was promptly advised of the dishonor of the bill, he presumes by due course of mail, and never had any idea that he could evade payment for want of notice.
It was likewise urged, with much earnestness by one *268 of the counsel, that no lien could be created, either legal or equitable, in a chose in action, without an assignment and actual delivery, and for which Montagu on Lien, was cited. But this argument is founded upon an erroneous assumption of the fact, an assignment and delivery having been made to the trustees, at the time of the creation of the trust.
It is objected, that this court cannot make a decree for want of proper parties; that Sommerville' is nota party to the first bill, and that after the death of Stump in 1822, it was not revived against his personal representatives, and Cooper, 33-7, and 2d Maddox’s Ch. 596, have been relied upon, to show that all parties in interest must be before the court. In my opinion, this cause ought not to be decided here, in a court of the last resort, upon technicalities; nor ought we to remand it to the court below, if substantial justice can now be rendered between the parties. By looking into the record, we find that Sommerville is a party to the first suit, as well as to the cross bill, although his answer purports to be an answer to the cross bill, and that the fund which he had originally as a trustee, has been for years in the hands of the receiver of this court.
Sommerville has no interest in this matter. What is it that gives a court of equity jurisdiction? It is not the trustee as an individual, but the trust; it is the fund which was in his hands; if it were necessary, the court would now appoint a trustee; as it is not, the court will decree the money to whoever may be entitled to it As it regards the personal representatives of Stump not being a party, the objection would be equally valid in both cases; his death was suggested in 1822; he was insolvent; he answered the bill before his death, and it appears from his answer that he had no interest, whatever, in the fund now in dispute; that it belongs either to the complainants in the first bill, or to the complainants in the second. Since the suggestion of his death, he has *269 been lost sight of by both parties in this cause; no decree is asked for against Stump or his representatives. In 2 Atkins, 295, Pawlet vs. Bishop of London, it is said, that if a plaintiff, on the hearing of the cause, waives the relief he prays against a person, it answers the objection for want of making such person a party: likewise, 2 Maddox, 174. It seems to me, that either to dismiss the bill, or remand the cause upon that ground, when, if his representatives were made a party, the decree must be the same, would be a great perversion of justice. The authorities which were referred to in argument, fully sustain the court in this view of the objection. 2 Maddox’s Ch. 174, 184. 1 Brown, 498. I Merivale’s Rep. 161. 18 John. 559. 2 Sch. and Lefroy’s Rep. 712. If the view which I have thus far taken be correct, the complainants in the first bill are entitled to a decree, unless there be something else which requires a postponement of their equity.
I will next advert to the rights which are claimed by thé complainants, Cox, Catron and M’Lemore, in the cross bill of 1820. The equity which they set up, is founded upon an alleged sale of fifis note, and promise of transfer, by Stump, to complainants Cox and Catron, with the assent of Fletcher, for the satisfaction of -their respective debts, after the same had been transferred and deposited with Sommerville, for the indemnity of Fletcher, and as it is believed, the ultimate security of Breedlove, Bradford and Robeson. The first inquiry, which presents itself, is, could such a sale impair the vested rights of the appellees? I think not, upon the authority of Shepherd vs. M’Evers, 4 John. Ch. 138. In that dase, the trust was created without the knowledge of the cestui que trusts. The court say, “these defendants, the trustees, accepted-that trust, and entered upon the execution of it, and it was not in their power, without the assent of the cestui que trusts, (in this case Breedlove, Bradford and Robeson,) or without the direction of this *270 court, to discharge themselves of the trust.” I take this to be a clear anfi settled rule of the court. The idea could not be tolerated for a moment, in a court of equity, that Fletcher, having become insolvent and indifferent about the note, could in consequence, by his act, change the rights of the parties; besides, they purchased with knowledge, as is clear from their own showing, as well as the evidence of Sommerville, and are therefore chargeable with the trust. He who takes an assignment, “with notice of a trust, takes it clothed with the trust.” 7 Cranch, 97. This note having been assigned to, and in the possession of Sommerville, even if the beneficial interest was in Stump, it would be but a chose in action. Stump then could only transfer an equity, and the junior equity must yield to the older. Qui prior est in tempore, potior est injure. See Montagu on Lien.
But I would ask, is there any legal evidence of this sale having been made, for the rules of evidence are the same in equity as at common law? Can the deposition of Catron be received? What is his situation? It appears from the bill itself, that as agent, he agreed to pay M’Lemore $700, and the balance of the note was to be applied to the payment of the debts due from Stump to Cox and himself. Cox’s debt is alleged to be between 5000 and $8,000, leaving between 1000 and $2,000 to be applied to his own. Is not this a certain, direct and immediate interest in the event of'the suit, which must disqualify him? The distinction taken by the counsel, that this witness is competent upon the first bill, not being a party to that, although he may not be competent upon the cross bill, is not considered accurate; for the question is not, whether he is a party, but whether he is interested in the result of the suit. This witness, however, is substantially a party in the first cause; he has placed himself in that situation by the cross bill; his interest is identified with that of Cox and M’Lemore; they are all litigating together about this *271 fund, and are therefore liable for costs at the discretion of the court. A witness liable for costs is not competent. 2 Starlde, 770. A plaintiff cannot give evidence for a co-plaintiff, because he is liable for costs. If his evidence were deemed material, and be was competent, his name should be struck out as co-plaintiff, and made defendant. This is the course indicated in 2d Maddox’s Chancery, 317: 4 Jacob, 577, 9. In this view of the objection, the authorities cited by the counsel for the appellants, (2 Starkie, 501, 745, and 4 Harris and M’Henry,) do not apply. I am of opinion, therefore, that the deposition of this witness must be rejected. There is no other witness recollected, who proves the sale to Cox and Catron. Stump speaks of it in his answer, but as it is a matter in avoidance, and not directly responsive to the complainants’ bill, it must be supported by proof, or the defendant could not avail himself of it. Simpson vs. Hart, 14 Johnson, 63. It seems to me then, for the reasons which I have stated, that Cox and Catron must fail in the case which is presented in their first cross bill of 1820.
I will now proceed to an examination of their equity, as stated in the amended bill of March, 1823. This bill exhibits a new and totally distinct ground of equity in favor of Cox alone, by virtue of an original lien upon these notes, having received them from Stump in the spring of 1819, as collateral security for the payment of $¡21,000. For the purpose of supporting this lien, complainants rely upon the evidence of Terrill, of Middleton, of Kyle, of Butler and Eddington. A good deal of what these witnesses say is vague, uncertain and inconclusive; there is enough, however, to incline the mind to a belief, that the three notes upon the Gustines of $8,000 each, endorsed by Middleton, (of which the note now in controversy was one) were, at some time in the spring of 1819, in the hands of Cox, as collateral security for his debt. In the view which *272 is taken of this point, it is not necessary to inquire in what way Cox parted with the possession oi these notes. Whether they were purloined from him by Stump, or given up for other security, or the possession voluntarily relinquished, is deemed wholly immaterial: for it seems to me demonstrably true, that at least so far as this note is concerned, he has utterly waived and abandoned all right to it whatever, and that he cannot now have the aid of this court. Let us recur to the proof upon this subject. We find from the testimony of Samuel Gustine, one'of the makers of-the notes, that some months after their execution, after Stump had left Natchez for Tennessee, and consequently sometime after Cox had these notes in possession, that he, Cox, called upon the witness and asked him their situation; that from the tenor of Cox’s conversation, the witness was induced to believe that Stump was in the possession of the notes; that after giving Cox certain information about them, Cox replied, that if he could do no better, he would endeavor to obtain the notes from Stump. Now, is this, I would ask, the language of a man who had been robbed of $24,000, or who had been deprived of that amount in any way? On the contrary, does it not show that ¡Stump was the rightful possessor of them, and indicate an intention on the part of Cox, to enter into a negotiation for the notes with Stump, provided he could make no better arrangement with him? If Cox, at this time, had been either the legal or equitable owner of these notes, would he not have said something about it to this witness, who was one of the makers, and by whom the money was to be paid? Would he not have cautioned him about paying them to Stump? It seems tome that he would; for we find him subsequently pursuing the same course, after he has purchased two of them. Cox then goes on to Nashville, the main theatre of Stump’s operations, and where his embarrassed and failing circum *273 stances must have been well known. What course does he there pursue? He sees Stump, engages in various treaties with him, according to his own statement, for the purpose of securing his debt, but never, from any proof in this cause, breathes a word to any human being that he is the rightful owner of these notes, or has any claim upon them whatever; nor does he make any attempt to coerce them from him by the laws of the country, although he must have been aware of the existence of the same testimony that has been produced in this cause. On the 7th August, 1820, at Nashville, he writes to his attorney in these words: “Mr Catron: Sir, Major Stump is to lift a note of § 12,-000, Stump and Daniel, endorsed by Stump and Cox, with two notes of the two Gustines, indorsed by Middleton. He is to give 8 per cent discouqt per annum; the balance to go to the credit of the note in suit, which he has the liberty of paying in other good notes, &c. If you get Gustine’s notes, take Stump and Daniel’s separate obligations, should the drawer and endorser not be good, &c.” This, in my judgment, is a recognition of the ownership of the notes being in Stump, by authorizing his attorney to trade for them, as the property of Stump. “If you get Gustine’s notes,” showing that it depended upon the pleasure of Stump whether he let him have them or not. He received these two notes of §8,000 each in part payment of his debt; and on the 2d of October, 1819, in further payment, Stump sold him a tract of land in Louisiana at the price of §4,000, and made him a deed for the same, the title to which turned out to be defective. Here, then, were payments made to the amount of §20,000. Cox does not, either in his first or second bill, make his debt against Stump exceed §24,000. (And it is not perceived how it could amount to that much, when Stump sold the negroes to Middleton at a considerable profit, only for §24,000.) How is it possible, then, at *274 that time, after payments were made to the amount of $¡24,000, that Cox should have, or that it was intended for him to have this $8,000 note now in dispute? And if the lien was once gone, it could not be revived, but by a subsequent contract; that subsequent contract, (which was stated in the first bill,) has already been examined. On the 29th November, 1819, as appears from the evidence of Terrill, he, Terrill, received a letter from Cox, post-marked Kingston, Tennessee, November 16th, 1819, on a part of which letter was the following notice: “Dr Samuel Gustine and L. P. Gustine; Gentlemen, I hold two notes of hand on you for $8,000 each, endorsed by William C. Middleton; the first due the 1st March, 1821, and the other-due 1st March, 1822. As the benefit of these notes is in myself, you will pay them to no other person; they both bear date on the 8th of January, 1819.” This notice the witness served on Samuel Gustine. Is it not surprising, that he should use such promptness and diligence, when he acquired possession of two of these notes by a fair trade, and yet be perfectly supine when the whole three were taken out of his pocket book by Stump, as he alleges? And would it not have been natural, if he had a Iona fide claim to the third, that he should have given some intimation about it when writing to these gentlemen about the two others? On the 1st September, 1820, the cross bill was filed; in which, the only equity, he claims, is by virtue of a contract after the note was in the hands of Som-merville, thereby clearly repelling the inference of any other equity. In October, 1822, the death of Stump is suggested upon the record. In March, 1823, four years after the original lien is pretended to have been acquired, and after the death of Stump, the amended bill was filed, in which Cox sets up this new equity, and asks this court to protect him in it. I am of opinion that this cannot be done. There are too many cir *275 cumstances of fiction with regard to it. If this lien ever existed, there must have been an end to it, either bj contract or voluntary abandonment. To decree for him, would be sanctioning a course of conduct that would enable any man to commit a fraud upon the community. Such being the views entertained by the court in regard to this latter equity, it is unnecessary to remark upon the authority cited for the appellants, in 20 John. 637, 644; nor upon 3 Russell; 1, 28, 40, quoted upon the other side.
The last question that remains for examination, is, whether the complainants in the first bill, Breedlove, Bradford and Robeson, have forfeited their claims to the assistance of this court, by a waiver andubandonment of their rights. It is insisted that Mr Fletcher and Thomas Hill, clearly establish it. Fletcher says, “that through Captain Eastland, he offered Captain Robeson the note, provided he would pay him $>700. He (Captain Robeson) did not accept my offer.” In another place he states, “that pending the attachment at New Orleans, he wrote to Breedlove, Bradford & Co. and offered them Gustine’s note, if they would release him as endorser on Stump’s draft; to which letter he received no answer; but Mr Thomas Hill, who was then their correspondent in this place, informed him that he had received a letter from them on the subject, and that they declined receiving the note.” The statement of Hill is, “that at the request of Fletcher, he made them the proposition, to take the note in discharge of the bill of exchange;” that in reply to this letter they remarked, that they expected to recover their demand “from the property of Fletcher, in the hands of his commission merchants in New Orleans, on an attachment which they had levied on the same;” and that they also stated, “they had, by one of their firm, or by an agent, applied to the payers of the note in question by way of inquiry of them on the *276 subject of it, and were informed that a legal set-off would be insisted upon.”
The law upon the subject is believed to be this; that in order to constitute a waiver, there must be a clear, unequivocal and decisive act of the party; an act done, which shows a determination in the individual not to have a benefit which is designed for him. What was the nature of the propositions submitted by Fletcher? One was, that he would give up this note upon their paying him $700; the other was, according to Fletcher, to take the note and release him as endorser; but as Hill understood it, in discharge of the bill of exchange. Could they be required to accept such propositions? Were they not at variance with the terms of the trust? propositions, in fact, to use the language of one of the counsel, to diminish their security? They might well decline these 'propositions. Fletcher and Stump had considerable property in their hands at that time; there were other parties liable to them upon the draft; they were in hopes to make the money by the suit in New Orleans; they were informed there would be some dispute about the note. Under these circumstances, they could not be required to accept this note in absolute discharge of their debt, when they did not know whether • the money could be collected or not. This note was assigned to Sommerville for the better security of the bill of exchange, as well as to indemnify Fletcher; suppose the proposition had been made in accordance with' the trust: Are you willing that this note should remain with Sommerville for your better indemnity; and if-the note is collected, and your debt not otherwise paid, are you willing to receive this money in payment? There is no reason to believe they would have declined it. The court cannot see that they relinquished any benefit that they were entitled to from the nature of the deposite. The letter which they wrote to Stump, March 31, 182Í, does not *277 prove it. This was after the present bill was filed. They could not tell the result of this suit; if decided in their favor, the money might not be collected. They understood, as they say in their letter, that the note was disputed; they wanted further security; they had a right to it if it could be obtained; they therefore press Stump for payment. I cannot perceive that this letter furnishes any evidence, that they were willing to give up any indemnity from this note. In 2 Whea. 394, the court say, “the bank had a right to require additional security from the endorser of the acceptance; and it cannot be perceived upon what principles this can be construed an extinguishment of its lien upon the shares of the acceptor. A creditor may lawfully take and hold several securities for the same debt from his joint debtors; and he cannot be compellable to yield up either until his debt is paid.” The cases cited by the counsel for the appellants, in 6 Vesey, 759, 16 Vesey, 278, and 1 Campbell’s Rep. 410, have been examined, and are not considered opposed to the principles which are here laid down. I cannot say, therefore, that the complainants, Breedlove, Bradford and Robeson, have done any act, which in the law amounts to a waiver and abandonment of their rights. The $700 due to M’Lemore, it seems to be conceded, should bo allowed him from this note. Upon this view of the case, the court are unanimously of opinion, .that the decree of the chancellor below be affirmed with costs.
Decree affirmed.