[Civ. No. 1279.   Third Appellate District.—November 4, 1914.]

In the Matter of the Petition of WILLIAM P. KELLY and EVA P. KELLY to have Mary Louise Donahoo, a Minor Child, Declared an Abandoned Child; M. J. DONAHOO et al., Appellants; W. P. KELLY et al., Respondents.

Parent and Child—Proceeding to Declare Child Abandoned—Insufficiency of Evidence to Show.—In a proceeding to have it determined that a minor child has been abandoned by its parents, where the evidence, without dispute, showed that, fearful lest the delicate physical condition of the mother was such that she could not properly nourish her two infants born at the same time, the parents arranged with the sister of the father to take the custody and care of one of the infants, a girl; that the father, during the period that the child was with his sister and until the latter became ill and unable to bestow proper care upon the baby, paid the custodian of said child for the service of caring for it; that, after the sister became ill, the father sent to the persons who had taken charge of the child the sum of $30.00 which, while intended to be used for the benefit of the sick woman, was doubtless in part or perhaps in full payment of her services in caring for the infant; that the general tenor of the language of letters written by both the father and mother of the child to its custodians, after the latter had voluntarily taken the custody of the infant, clearly indicated an intention on the part of the parents to reimburse them for their services in looking after and attending to the welfare of the child; and that, as a matter of fact, the father agreed to compensate the custodians for their services to the child whenever he found himself financially able to do so, the court was not legally justified in declaring the minor to be an abandoned child within the meaning of section 224 of the Civil Code, providing that "any child deserted by both parents or left in the care or custody of another by its parent or parents," without any agreement or provision for its support, for a period of one year, is deemed to be an abandoned child.

Id.—Severing Relation Between Parent and Child—Statute to be Strictly Construed.—A statute which authorizes a court upon a showing of the existence of certain designated facts or conditions, to make a decree or an order whereby the natural relation between parent and child is destroyed, must be strictly construed, and is, therefore, to be applied in those cases only in which the precise facts or conditions prescribed by such statute are shown to exist.

Id.—Adoption—Section 224 Civil Code to be Strictly Construed.—While the effect of an adjudication that a minor is an abandoned child, under the terms of section 224 of the Civil Code, is not to directly sever the relation of parent and child, still, since the result

of such adjudication under said section is to enable a third party to adopt such child without first procuring the consent of its parents, thus practically depriving the parents of any voice in the matter of an adoption, in case a proceeding for that purpose be inaugurated, that section is also to be subjected to a strict construction when its application is invoked.

ID.—FAILURE OF PARENTS TO SUPPORT CHILD—ABANDONMENT NOT SHOWN BY.—The mere failure of the parents of a minor child, in the custody and under the care of a third party, to contribute, while it is in such custody and care, to the support and maintenance of such child for a period of one year, does not itself constitute an abandonment of the minor within the purview of section 224 of the Civil Code. To constitute abandonment under said section of the code, it must appear by clear and indubitable evidence that there has been by the parents a giving up or total desertion of the minor. In other words, there must be shown an absolute relinquishment of the custody and control of the minor and thus the laying aside by the parents of all care for it.

ID.—ABANDONMENT—QUESTION OF INTENTION—EVIDENCE MUST BE CLEAR. Abandonment is a question of intention, which must be shown by a clear, unequivocable, and decisive act of the party—an act done that shows a determination not to have the benefit of the right to which he is entitled.

ID.—PROMISE OF FATHER TO COMPENSATE CUSTODIAN OF CHILD—AGREEMENT FOR SUPPORT—SECTION 224, CIVIL CODE.—In such a case the promise by the father of the child that he would compensate, when able to do so, the custodian of the child for taking care of and supporting it, constitutes the "agreement or provision for its support," contemplated by section 224 of the Civil Code, and the fact that the father failed to keep said promise can prove nothing but a violation of the agreement.

ID.—ATTACHMENT OF CHILD AND CUSTODIAN FOR EACH OTHER—BETTER CIRCUMSTANCES OF CUSTODIAN THAN OF PARENTS NOT MATERIAL.— The circumstance that the child and its custodians have formed a strong attachment for each other and that the custodians are better circumstanced than the parents for caring for the child, while perhaps more or less important in disposing of a guardianship proceeding, cannot enter into the determination of the question of adoption against the consent of the parents, or of a proceeding which, if sustained, would render it legally unnecessary to consult the desires or wishes of the parents in a proceeding looking to the adoption of their minor child by another.

APPEAL from a judgment of the Superior Court of Tuolumne County. G. W. Nicol, Judge.

The facts are stated in the opinion of the court.

Rowan Hardin, for Appellants.

Crittenden Hampton, for Respondents.

HART, J.—This proceeding, as its title readily indicates, was instituted by the above-named petitioners, in the superior court of Tuolumne County, for the purpose of securing the judgment of said court that one Mary Louise Donahoo, a minor, is an abandoned child within the purview of section 224 of the Civil Code, the ultimate object of the judicial declaration so sought herein being to enable said petitioners to adopt said minor.

The petition alleges facts sufficient to state a case of abandonment under the section of the Civil Code above mentioned and the same was answered and contested by the parents of the minor.

At the hearing of the proceeding, evidence for and against the claims of the petition was taken, the court found that said child had been abandoned by its parents within the contemplation of said section 224 of the Civil Code, and rendered and caused to be entered judgment in accord with said finding.

This appeal is prosecuted by the parents of said minor from said judgment.

The single question submitted on this appeal is whether the said minor is an abandoned child within the meaning and intent of the code section above referred to.

Among other provisions, said section contains the following: "Any child deserted by both parents or left in the care and custody of another by its parent or parents, without any agreement or provision for its support, for the period of one year, is deemed to be an abandoned child within the meaning of this section . . . " It is claimed and the petition avers, that the parents of the minor concerned here left said minor in the care and custody of the petitioners, without having made any agreement or provision for its support, for a period of more than one year.

The salient facts upon which this controversy is to be determined are practically undisputed and may be briefly stated as follows:

The minor involved in this controversy is one of twins—a boy and a girl—born to the contestants, Mr. and Mrs. M. J. Donahoo, on the twenty-second day of January, 1909. The

mother of the twins was, after the birth thereof, left in such delicate health that she became apprehensive that she could not properly take care of and maintain both the infants, and the parents, therefore, came to the conclusion that the infants would fare the better by placing one in the custody and under the control of a sister of the father of the children, a Mrs. Emma Swanson, then residing in the city of Sonora. To this end, and some three weeks after the birth of the infants, the father and mother completed arrangements whereby Mrs. Swanson took the custody and assumed the responsibility of caring for and maintaining the girl baby.

Shortly after the infant was given into the custody of Mrs. Swanson, and while yet in such custody, the Donahoos departed for Los Angeles, where they took up their residence.

The infant remained with Mrs. Swanson until the month of June, 1912—a period of over three years—when the latter was taken so seriously ill as to have suffered mental derangement to a degree which required her removal to and, for a brief period, incarceration in the state hospital for the insane at Stockton.

The petitioners were near neighbors of Mrs. Swanson and so became aware of her illness immediately upon the happening thereof. They gave her much attention and did all that lay within their power to make her as comfortable as she could be made under the circumstances. They took charge of and ministered to the wants and necessities of the baby girl during Mrs. Swanson's illness and prior to her removal to the asylum. They communicated the fact of Mrs. Swanson's illness to the Donahoos, and informed them that she was greatly embarrassed financially. Upon receiving that information the father of the child forwarded to the petitioners, for the use and benefit of Mrs. Swanson, the sum of thirty dollars.

After Mrs. Swanson had been committed and taken to the asylum, the petitioner, William P. Kelly, addressed a letter to the parents of the child in which he declared that he and his wife had become greatly attached to the baby, that they had no children of their own and that they desired to adopt the infant. To that proposition no response was made by the Donahoos, so far as the record discloses.

The petitioners retained custody of the child after Mrs. Swanson was sent to the asylum and for over a year cared for and supported her. During that period a number of letters

was written by the Donahoos to the petitioners concerning Mrs. Swanson and the child. In one of said letters the father of the baby explained that he had just suffered the loss of several hundred dollars through the failure of a concern for which he had been working, but that he was then working for another company and that, "as soon as I get a pay day, I will send you more money, and as often as I do get one." He further stated in said letter that "if anything should happen to sister (referring to Mrs. Swanson) we will arrange about Louise," referring to the baby. The other letters above referred to as having been written to the Kellys by the Donahoos disclose a commendable degree of parental solicitude for the child, and, while they contained no direct statements indicative of an intention on the part of the Donahoos to compensate the petitioners for caring for and supporting the baby, the general tenor of their language does not support the conclusion that the parents intended to abandon or relinquish their right to its custody.

It appears that, a few months after being committed to the asylum, Mrs. Swanson sufficiently recovered her physical and mental health to justify her discharge from that institution, and so, in the month of December, 1912, she left the asylum and went to Fresno, where she remained until July, 1913, when, at the request of the Donahoos, she went to Sonora for the purpose of regaining possession of the child. Mrs. Swanson testified in part as follows: "As soon as I regained my health (after she was released from the asylum), I was in communication with Mrs. Kelly all the time relative to the welfare of the little girl. In June, 1913, arrangements were made with Mr. Donahoo to send me to Sonora to get the child, as shown by the letter from Mr. and Mrs. Donahoo to me, dated the 16th day of June and the 23d day of June, 1913. I came to Sonora about the 10th day of July for the purpose of getting the little girl, acting in behalf of Mr. and Mrs. Donahoo. I did not know that any proceedings had been commenced at that time to have the child declared an abandoned child. I was informed of such proceedings by Mr. Kelly after I reached Sonora. From my knowledge of the conditions surrounding Mr. and Mrs. Donahoo in this matter I know neither of the parents had any intention at any time of abandoning the little girl. At one time I tried to get the consent of the father and mother to adopt the little girl, but

they refused to consider the matter at all. When I came to Sonora in July, 1913, Mr. Kelly told me that Mr. Donahoo had promised to pay for the care of the child, but that he had failed to keep his promise. I have recollections during lucid moments of my sickness in July, 1912, of Mrs. Kelly telling me that she and her husband would care for the child and that Mr. Donahoo had promised to pay for the care of the child. At the time I was taken sick, Mr. Donahoo was living in Los Angeles. After I regained my health, I knew Mr. Donahoo's financial condition during the latter part of the year 1912 and the early part of the year 1913, and knew that he was out of work a portion of the time and that he had sickness in the family and was unable to pay his bills. The sum of money I had in my possession at the time I was taken sick was money sent me by Mr. Donahoo. . . . Mr. Donahoo sent me money for the support of the child and whenever I requested it he sent me money for my support.''

M. J. Donahoo testified that, during the time the child was with his sister, Mrs. Swanson, he paid for its support and maintenance and at times paid for the support of Mrs. Swanson. He said that, prior to the receipt from William P. Kelly of a telegram on June 3, 1912, telling him of the illness of Mrs. Swanson, he was unaware of the latter's physical and mental condition. At that time his wife was ill in Los Angeles and he was unable to collect money which was due him and for these reasons he did not go to Sonora to take possession of his child and to render succor to his sister. ''I knew,'' he continued, ''the child was in good hands with Mr. and Mrs. Kelly and was satisfied that I could make settlement with them afterwards for the trouble in caring for the child, when I had means to do so. Prior to the writing of the letter of July 7th, the petitioners' Exhibit A, I wrote to Mr. Kelly asking him to contribute for the child and that I would contribute to him for it as soon as I was able. The money which I mentioned being sent in the letter marked petitioners' Exhibit B was intended to apply toward the support of the child, and in compliance with my promise to reimburse Mr. Kelly for his trouble and expense in caring for the child. At no time did I have any intention of abandoning said child, and it was my intention to come and get the child and reimburse Mr. Kelly as soon as my finances would permit. . . . I am in a position now to pay Mr. Kelly a reasonable sum per

month to reimburse him for his trouble in caring and providing for said child and I am desirous of obtaining the child and caring and providing for her. As soon as these proceedings were commenced I tendered money to Mr. Kelly, being the sum of $10.00, as testified to by Mr. Kelly herein.''

Both Mr. and Mrs. Kelly testified that when Mrs. Swanson was taken ill, as above explained, they found that the child had been very much neglected; that she was weak and emaciated for want of sufficient food; that she was without proper raiment and unclean of body. They declared that they had never been remunerated by her parents for the care and support they had given the child for a period of over one year, and that no provision had been at any time made by the parents for the child's care and maintenance.

The foregoing constitutes a statement in substance of all the facts and some of the testimony upon which the judgment appealed from was founded. As stated, and as must readily be observed from an examination of the above statement, there is in reality no dispute as to the facts, and the sole question is: Was the court legally justified in declaring and adjudging upon said facts that the minor involved here was an abandoned child within the meaning of section 224 of the Civil Code?

We cannot persuade ourselves that the conclusion of the learned trial judge is sustainable.

In the first place, it is to be remarked that a statute which authorizes, upon a showing of the existence of certain designated facts or conditions, a court to make a decree or an order whereby the natural relation between parent and child is destroyed, must be strictly construed and is, therefore, to be applied in those cases only in which the precise facts or conditions prescribed by such statute are shown to exist. As is said in the case of *Matter of Cozza,* 163 Cal. 514, 522, [Ann. Cas. 1914A, 214, 126 Pac. 161] : ''The adoption of a child was a proceeding unknown to the common law. The transfer of the natural right of parents to their children was against its policy and repugnant to its principles. It had its origin in the civil law and exists in this state only by virtue of the statute which, as above stated, expressly prescribes the conditions under which adoption may be legally effected. Consent lies at the foundation of statutes of adoption, and under our law this consent is made absolutely essential to confer jurisdiction on the superior court to make an order of adoption, un-

less the conditions or exceptions exist specially provided by the statute itself and which render such consent of the parents unnecessary. Unless such consent is given, or, for the exceptional causes expressly enumerated is expressly dispensed with, the court has no jurisdiction in the matter.''

While the effect of an adjudication that a minor is an abandoned child under the terms of section 224 of the Civil Code is not to directly sever the relation of parent and child, still, since the result of such adjudication under said section is to enable a third party to adopt such child without first procuring the consent of its parents, thus practically depriving the parents of any voice in the matter of an adoption, in case a proceeding for that purpose be inaugurated, that section is also to be subjected to a strict construction when its application is invoked.

In the second place, we are persuaded to say that the mere failure of the parents of a minor child, in the custody and under the care of a third party, to contribute, while it is in such custody and care, to the support and maintenance of such child for a period of one year, does not itself constitute an abandonment of the minor within the purview of said section of the code. If the rule were otherwise—that is, if an adjudication of abandonment could legally be predicated on the mere failure by the parents to support their minor children—the result, in innumerable instances, would be to work a manifest wrong upon parents. It is not difficult to conceive of circumstances wholly beyond the control of parents having the deepest affection for their children which would render it impossible for them to support their children or care for them in a proper way. It would indeed, be a harsh rule which would, under such circumstances, authorize a judicial determination by which the natural right of the parents to the custody and control of their children would be forever destroyed.

To constitute an abandonment under said section of the code it must appear by clear and indubitable evidence that there has been by the parents a giving up or total desertion of the minor. In other words, there must be shown an absolute relinquishment of the custody and control of the minor and thus the laying aside by the parents all care for it. (Crabb on Synonyms; *Pidge* v. *Pidge,* 44 Mass. (3 Metc.) 257, 265; *Sikes* v. *State* (Tex.), 28 S. W. 688, 689; *Nugent* v. *Powell,* 4 Wyo.

173, [62 Am. St. Rep. 17, 20 L. R. A. 199, 33 Pac. 23] ; *Dikes* v. *Miller,* 24 Tex. 417, 424; *Middle Creek Ditch Co.* v. *Henry,* 15 Mont. 558, [39 Pac. 1054, 1058].)    And abandonment is a question of intention, which must be shown by a clear, unequivocal, and decisive act of the party—an act done that shows a determination not to have the benefit of the right to which he is entitled. (*Breedlove* v. *Stump,* 11 Tenn. 257, 276.)

We have been unable to perceive in the evidence adduced at the hearing of this proceeding a single fact which may fairly be said to indicate an intention in the parents of the child concerned here to desert said minor or relinquish their natural right to her custody, care, and control.    To the contrary, according to our interpretation of the proofs, the parents not only manifested a desire to perpetuate all the consequences of the natural relation subsisting between them and the infant, but displayed commendable anxiety for its welfare.

The evidence, without dispute, shows that, fearful lest the delicate physical condition of the mother was such that she could not properly nourish the two infants born at the same time to her, the parents arranged with the sister of the father to take custody and care of the infant girl; that the father, during the period that the child was with his sister and until the latter became ill and unable to bestow proper care upon the baby, paid the custodian of said child for the service of caring for it; that, after Mrs. Swanson became ill, the father sent to the petitioners the sum of thirty dollars which, while intended to be used for the benefit of the sick woman, was doubtless in part or perhaps in full payment of her services in caring for the infant; that the general tenor of the language of the letters from both the father and mother of the child to the petitioners, after the latter had voluntarily taken the custody of the infant, clearly indicated an intention on the part of the parents to reimburse the petitioners for their services in looking after and attending to the welfare of the child; that, as a matter of fact, the father agreed to compensate the petitioners for their services to the child whenever he found himself financially able to do so.

Under the facts as thus recapitulated, and which, as stated, stand uncontradicted, it is difficult to conceive how an adjudication that the minor in controversy is an abandoned child,

or was abandoned by its parents, within the meaning of the language of section 224 of the Civil Code, can be upheld.

The promise by the father of the child that he would compensate, when able to do so, the petitioners for taking care of and supporting it, constituted the ''agreement or provision for its support'' contemplated by said section, and the fact that the father failed to keep said promise can prove nothing but a violation of the agreement.

It may be true that the child, now approaching her sixth year, and having been with the Kellys for over a year, has formed a strong attachment for the petitioners, as they no doubt have for the child. It may also be true that the Kellys are better circumstanced than are her parents for bestowing upon her proper care. But, while these considerations might, perhaps, be of more or less importance in disposing of a guardianship proceeding, they cannot, obviously, enter into the determination of the question of adoption against the consent of the parents or of a proceeding, like the present, which, if sustained, would render it legally unnecessary to consult the desires or wishes of the parents in a proceeding looking to the adoption of their minor children by another.

We conclude that the learned trial judge erred in the conclusion crystallized in the judgment from which this appeal is prosecuted, and said judgment is, therefore, reversed.

Chipman, P. J., and Burnett, J., concurred.