IN THE MATTER OF THE ADOPTION OF
GEISON TOM, A MINOR.

NO. 2634.

IN THE MATTER OF THE ADOPTION OF
PATRICIA SHUH YI TOM, A MINOR.

NO. 2635.

ARGUED APRIL 16, 1947.          DECIDED JUNE 3, 1947.

KEMP, C. J., PETERS AND LE BARON, JJ.

OPINION OF THE COURT BY KEMP, C. J.
(Peters, J., dissenting.)

On February 13, 1946, Samuel L. Yee and wife Doris Loo Yee (hereafter referred to as Dr. and Mrs. Yee) filed their petition in the circuit court, first circuit, at chambers in adoption, for leave to adopt Geison Tom, a minor, wherein it is alleged: That said minor was born March 24, 1939, of Patrick Wah Hoon Tom (hereafter referred to as the father or appellant) and Bernice Yun Yee Loo Tom (hereafter referred to as the mother), then husband and wife and who were divorced November 12, 1943; that the petitioner, Mrs. Yee, is a sister of the mother of said minor; that the father left Hawaii November 28, 1943, and has never returned and that petitioners are informed that he at one time resided at 58 La Salle Street, New York City, but petitioners have no knowledge of his present address; that the mother died September 24, 1945; that said child has been under the care, custody and control of petitioners since November 28, 1943; that the father has abandoned

said child for a period in excess of six months and voluntarily surrendered the care and custody of said child to petitioners and others for a period of over two years; that petitioners are fit and proper persons and financially able to have the care, custody and control of said minor; that said child is physically, mentally and otherwise suitable for adoption by petitioners, who bear great love and affection toward him; and that such adoption will be for the best interest of said child.

On the same day, February 13, 1946, Louise Loo, an unmarried woman, filed her petition in the same court for leave to adopt Patricia Shuh Yi Tom, born September 7, 1940, of the same parents as Geison Tom. The petitioner is a sister of the mother of Patricia and her petition contains identical allegations with the petition of Dr. and Mrs. Yee.

The court ordered notice of hearing of the two petitions to be served on the father by publication in the Honolulu Advertiser, which was done, and in response thereto on August 27, 1946, the father answered each of the petitions, denying that he had either abandoned said child for a period in excess of six months or that he had voluntarily surrendered the care and custody of said child to petitioner and others for a period of two years, and denying that it is for the best interest of said child that said child be adopted by petitioner. There was no denial of other allegations in the petitions.

The two petitions were heard together and the circuit judge decreed the adoptions as prayed. In each decree there are findings that the father had abandoned the child for a period in excess of six months and had voluntarily surrendered the care and custody of the child to petitioner and others for a period over two years; that the petitioner is a fit and proper person to be and become the parent of said child and financially able to give the child a proper

home and education; that the adoption will be for the best interest of the child.

From the decrees the father prosecutes these appeals, which have been briefed and argued together, and which will be disposed of by this opinion.

Our statute, section 12271, Revised Laws of Hawaii 1945, provides in part:

"Written consent must be given to the adoption of the child, if of the age of sixteen years; and in all cases of adoption written consent shall be given by each of the living legal parents who is not hopelessly insane, habitually intemperate, or has not abandoned the child for a period of six months, or who has not voluntarily surrendered the care and custody of the child to another for a period of two years or over * * * . If the parents are unknown or have so abandoned or surrendered the child, the consent to adoption shall be signed by the legal guardian of the child; or if there be no legal guardian, then the court may appoint some suitable person to act in the proceedings as the next friend of the child; *provided*, however, that no hearing upon a petition for adoption, where the written consent of each of the living parents has not been obtained, shall be had until such non-consenting parent shall have had due notice, actual or constructive, as hereinafter provided, of the time and place of hearing."

The appellant specified errors which he condensed into two questions presented for decision, as follows:

"1. Did the lower Court err in finding that Mr. Tom had abandoned his children, PATRICIA AND GEISON, for a period in excess of six months, or had voluntarily surrendered the care and custody of said children to the Petitioners and others for a period of two years within the meaning of the Adoption Statute, so as to render unnecessary Mr. Tom's consent to the adoption of his children?

"2. If the findings of the lower Court that Mr. Tom

had abandoned and surrendered his children within the meaning of the Adoption Statute be upheld on this Appeal, did the lower Court err in having failed to require that consent to the adoption of the children be signed by their legal guardian, or if there be no legal guardian, by the next friend of the children appointed by the lower Court, pursuant to the provisions of the Adoption Statute, before decreeing the adoption of the children?"

If either voluntary surrender or abandonment for the statutory period is supported by sufficient evidence the finding on the issue first stated must be upheld.

The evidence bearing upon the questions of abandonment and voluntary surrender of the children by the father is not in serious conflict and may be summarized as follows: Sometime within the first half of the year 1942 the mother of said children, as a result of illness, became unable to personally care for them. She and her husband and their two children then went to live with Dr. and Mrs. Yee. When an operation disclosed the nature of the mother's illness to be a malignant cancer of the breast her immediate relatives, including her sisters Mrs. Yee and Miss Loo, were anxious to have her go to New York where she could receive a character of treatment not available in Honolulu. The father opposed her going to New York for treatment for the alleged reason that her condition was such that treatment could not prevent her early death and it would be a waste of money to send her away for treatment. Her immediate family, however, including her brother-in-law, Dr. Yee, arranged for her trip to New York and Dr. Yee went with her and placed her in the hospital where the treatment was to be administered. The only evidence as to who paid the expense of her sojourn in New York for this treatment is that given by the father, who says that he sent her some six or seven thousand dollars while she was away. She left Honolulu for New York in

September 1942 and left her children and her husband living with the family of her sister and brother-in-law, Dr. and Mrs. Yee. She returned to Honolulu in June of 1943, at which time she was still physically unable to look after and care for her two children, and she returned to the home of Dr. and Mrs. Yee, where she continued to reside until she again left Honolulu in September of 1943. Just prior to her departure in 1943 the question of what should be done with the children was discussed by Mrs. Yee, Miss Loo, the father and mother, and a sister of the father, at which time it was agreed that Miss Loo should take Patricia and that Geison should remain with Dr. and Mrs. Yee. When the mother left Honolulu in September 1943, the father remained at the home of Dr. and Mrs. Yee until Thanksgiving Day of that year, when he left the Territory. Before he left the Territory, Mrs. Yee attempted to have an understanding with him as to the care and possible adoption of his children, but was unable to reach one. When told that the then arrangement could not continue indefinitely, he insisted that he would not be gone from Honolulu more than two or three months. He proceeded directly to New York where he arrived in December 1943 and where he has resided ever since. From the time he left the Territory he has not at any time communicated with Dr. and Mrs. Yee or with Miss Loo or with his children, nor has he contributed or offered to contribute anything to the support of his children at any time since they have been in the custody of the petitioners. He never returned to Honolulu until August 1946, when he came solely for the purpose of attending the trial of these adoption proceedings. When the mother left Honolulu in September 1943 she first went to Reno, Nevada, where in November 1943 she obtained a divorce from her husband, and later went to New York for further treatment. She again returned to Honolulu and to the home of her sister, Mrs.

Yee, in June of 1945, where she resided until her death, September 24, 1945.

The father's evidence as to what he plans for his children if the adoptions are denied follows:

"Q You feel that you can take care of the children?

"A Yes.

"Q Now, what arrangement have you got to take care of these children?

"A Well, I have my sister in Sacramento.

"Q And she is willing to take care of the children?

"A Yes.

"Q You will be there to supervise?

"A I will be there to supervise.

"Q You have at no time shown any intention of taking the children away from Louise and Doris here?

"A No."

When questioned as to why he felt that it would not be better that the children be adopted he replied: "Because if they are adopted they have a stigma." The subject was not further pursued.

The only Hawaii case relied upon is *Adoption, Virginia De Silva*, 32 Haw. 443. There the mother upon procuring a divorce from her husband consented to the inclusion in the decree of divorce of a provision awarding the care, custody and control of the child to the husband and reserving to her the "right to visit said minor child once a week, on Sundays, wherever said minor child may then be residing, between the hours of one and 5 P. M." Held, that such a qualified care and custody as was awarded to the father and consented to by the mother being subject to revocation by the judge upon the application of either party and upon proper showing, the surrender, in so far as it may be considered such, not being complete does not constitute a surrender of the care and custody of the child within the meaning of our statute on adoption, and that her written

consent to the adoption remained indispensable. No question of abandonment was raised or discussed in this case. We must therefore resort to decisions from other jurisdictions for guidance in deciding whether or not the evidence is sufficient to support the finding of abandonment.

The consent of the natural parents or surviving parent to an adoption proceeding is quite uniformly required in the statutes of the various States unless the parent has deserted the child or failed to support it. (1 Am. Jur., Adoption of Children § 36.)

"The right of a parent with respect to his child is not an absolute paramount proprietary right or interest in or to the custody of the infant, but is in the nature of a trust reposed in him, which imposes upon him the reciprocal obligation to maintain, care for, and protect the infant, and the law secures him in this right so long as he shall discharge the correlative duties and obligations, and no longer." 1 Am. Jur., Adoption of Children § 41.

There is a sharp conflict of authority as to what conduct amounts to an abandonment within the meaning of the statutes. In some jurisdictions the abandonment which will render parental consent to adoption unnecessary has been defined wholly or in part by statute. Decisions from those States are not helpful. In the States where the term has not been defined by statute the term is generally construed to mean no more than neglect or refusal to perform the natural and legal obligations of care and support which parents owe to their children. Our statute contains no definition. When once the abandonment is shown to have existed it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child. Where a resumption of parental rights would not be for the best interests of the child, the court may lawfully deem the abandonment irrevocable, so far as the claims of the parent are con-

cerned.    (2 C. J. S., Adoption of Children § 21 d [2].)

It must be apparent that it would be difficult to frame a definition of abandonment which could reasonably be applied to all cases.    The most successful attempt to frame such a definition coming to our attention is contained in *In re MacLean*, 179 N. Y. S. 182, where it is said that "The term 'abandonment' means neglect and refusal to perform the natural and legal obligations of care and support.    If a parent withholds his presence, his love, his care, the opportunity to display filial affection, and neglects to lend support and maintenance, such a parent relinquishes all parental claim, and abandons the child."    Citing *Matter of Larson*, 31 Hun, 539.

In *Winans* v. *Luppie*, 47 N. J. Eq. 302, 20 Atl. 969, it is held that the statutory notion of abandonment does not necessarily imply that the parent has deserted the child or even ceased to feel any concern for its interests; that it may fairly and does import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child; that when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child; that when, in pursuance perhaps of the abandonment, new ties have been formed and a new station in life has been taken by the child it might be unjust that, solely because of the parent's caprice, legal sanction should be refused to the new conditions and that under such circumstances a court might lawfully deem the abandonment irrevocable so far as the claims of the parent were concerned.

*In re Potter*, 85 Wash. 617, 149 Pac. 23, holds that the mere filing of an objection to the adoption by a parent is not sufficient to show that there was no previous abandonment.    The court, in holding that where an abandonment

has been shown the best interests of the child is the paramount issue, reasoned somewhat as follows: It cannot be said because a woman has given birth to a child that she has a mother love for it. Mother love does not depend upon the pains and perils of childbirth. It is not every child that is welcome. On the other hand, there is an affection that grows from care and association and the tender ministrations which are prompted by heartfelt sympathy for the weak and helpless. These beget a love as real as the love of a mother, and more, for the one who voluntarily assumes such a privilege must have far deeper maternal instincts than one who is an unwilling mother.

A very recent well-reasoned case by the supreme court of Pennsylvania is *Davies Adoption Case*, 353 Pa. 579, 46 A. (2d) 252, from which we quote the following: "Abandonment is not an ambulatory thing the legal effects of which a delinquent parent may dissipate at will by the expression of a desire for the return of the discarded child. We do not mean to say that the natural parental right to a child, which has been nullified by abandonment, may not later be retrieved. It may be. But, as the parent's consent to an adoption is no longer necessary, once abandonment has been proven with required legal sufficiency, the welfare of the abandoned child is the primary and paramount concern of the court unaffected by the desire or caprice of the abandoning parent. * * * The emotional disturbance to a child that would threaten from its being removed summarily and permanently from familiar and agreeable surroundings and associations, incident to the only parental control and supervision it has ever known, could have a very harmful effect on the child's whole life. Fortunately, the law's regard for a child's welfare does not admit of any such injury or harm being done it."

In *Parsons* v. *Parsons*, 101 Wis. 76, 77 N. W. 147, the applicable statute is quoted in the opinion as follows: "No

such adoption shall be made without the written consent of the living parents of such child, unless the court shall find that one of the parents has abandoned the child, or gone to parts unknown." Said the court: "Thus it will be seen that, upon the fact being established that the living parent has abandoned his child, he is deemed by the statute to have relinquished all parental right to be consulted in respect to the child's welfare, and his consent to the adoption is therefore dispensed with. The term 'abandon' obviously means no more than neglect or refusal to perform the natural and legal obligations of care and support which parents owe to their children."

There are cases cited and relied upon by the appellant which are in conflict with the rationale of the decisions to which we have referred. *In re Bistany*, 239 N. Y. 19, 145 N. E. 70, is relied upon by appellant in opposition to the holding that he had abandoned his children within the meaning of the statute. That case was decided by a divided court. The majority opinion was by Cardozo and the minority opinion by McLaughlin. The majority opinion cited no authority for its conclusion, whereas the minority opinion cited numerous authorities supporting its conclusion. We now have referred to us two additional New York cases more recent than the *Bistany* case, which hold with the minority opinion in that case. They are *In re Willing's Adoption*, 43 N. Y. S. (2d) 834 (1943), and *In re Munzel*, 290 N. Y. S. 178 (1936). We concur in the strong dissent of Judge McLaughlin in the *Bistany* case, and in the opinion of the surrogate in the case of *In re MacLean, supra*. It can hardly be questioned that the evidence which we have summarized meets the test of sufficiency laid down in these opinions.

What, then, is the effect of the abandonment upon the rights of the father of the abandoned child? His written consent to the adoption is no longer necessary but he still

must be given proper notice of the time and place of hearing and full opportunity to contest the adoption. However, under such circumstances the welfare of the abandoned child becomes the primary and paramount concern of the court, unaffected by the desire or caprice of the abandoning parent. (*Davies Adoption Case, supra.*)

Although the appellant in his answer denied that it would be for the best interest of his children that they be adopted, we find the evidence to be amply sufficient to support the conclusion of the circuit judge. Appellant admitted in effect that he is not prepared to give his children a home in New York where he is domiciled. His home there consists of a studio apartment. The only alternative suggested was that his sister in Sacramento, California, is willing to take care of the children; but the record is silent as to the suitableness of the home of his sister or as to her financial ability to properly care for them. It is apparent that the appellant has no intention of establishing a home in which to rear his children and personally nurture and care for them, and that he would be content to leave them permanently where they are.

The complaint occasioned by the failure of the circuit judge to appoint some suitable person to act in the proceedings as the next friend of the children deserves very little consideration. The statutory authority for the appointment is permissive instead of mandatory. In other words, it is not jurisdictional (*Van Matre v. Sankey*, 148 Ill. 536, 36 N. E. 628) and the record fails to show that the question of the necessity for such an appointment was raised below. It is not argued that the children, for whose benefit the statute was enacted, have suffered for the want of a next friend. Under such circumstances it is apparent that no prejudicial error was committed.

The decrees appealed from are affirmed.

*H. Y. C. Choy (Fong & Miho* with him on the briefs) for appellant.

*J. G. Anthony (Robertson, Castle & Anthony* on the briefs) for appellees.

### DISSENTING OPINION OF PETERS, J.

I respectfully dissent. In my opinion, the evidence negatives a voluntary surrender of the care and custody of these children and is insufficient to sustain a finding of abandonment.

The terms "abandonment" and "voluntary surrender" as employed in Revised Laws of Hawaii 1945, section 12271, are not synonymous. Both have to do with the relinquishment by natural parents of the care and custody of their minor children to others but while the effect is the same, that is, relinquishment is complete, the means of its accomplishment are different. The majority of the adoption statutes of other States to which recourse has been had do not include voluntary surrender as a cause of disqualification to refusal of parental consent. The term "abandonment" alone is used and voluntary surrender has been construed as an abandonment.[1] Of the four statutory causes of disqualification to refusal of parental consent contained in section 12271, two are "abandonment" and "voluntary surrender of care and custody" to another. The effect of the association of both terms in the same section as separate grounds for dispensing with parental consent is to restrict their definitions and connotations. The term "abandoned" as used in the statute does not therefore include "voluntary surrender" but refers to the inference of law that arises from the unilateral acts of the parent or parents having the care and custody of their

---

1 In Re Cohen's Adoption, 279 N. Y. Supp. 427.

children, while the term "voluntary surrender" has reference to the bilateral acts of the parent or parents having the care and custody of their children and the person or persons to whom that care and custody is relinquished. Moreover, the term "abandoned" as employed in the statute does not mean mere neglect or negligent failure to observe parental duty.[2] The abandonment must be willful[3] and with the settled purpose "to forego all parental duties."[4]

The severance of the legal relation existing between a natural parent and his or her child without the consent of the former is in derogation of a substantial natural right[5] and where consent is dispensed with only under certain statutory conditions adoption without the consent of the parent must come clearly within the statutory exceptions. Hence it is that in adoption by judicial proceedings the provisions of the statute dispensing with consent are strictly construed. This strict construction is implemented by imposing upon those seeking the adoption of children a degree of proof not ordinarily required in civil actions. Differently from the usual rule that he who has the affirmative must sustain his position probatively by a preponderance of the evidence, in adoption cases before it may be said that a parent has abandoned or voluntarily surrendered the care and custody of his or her child to another, the evidence in support of the alleged abandonment

---

[2] In Re Guardianship of Baldwin, 130 Ore. 206, 278 Pac. 1078, 1079.

[3] Lacher v. Venus, 177 Wis. 558, 188 N. W. 613; Truelove v. Parker, 191 N. C. 430, 132 S. E. 295, 299.

[4] State Ex Rel. Le Brook v. Wheeler, 43 Wash. 183, 86 Pac. 394, 396, cited with approval In Re Walker, 170 Wash. 454, 17 P. (2d) 15.

[5] Meyer v. Nebraska, 262 U. S. 390, 399; Pierce v. Society of Sisters, 268 U. S. 510, 535; Sinquefield v. Valentine, 159 Miss. 144, 132 So. 81, 83; In re Knott, 138 Tenn. 349, 197 S. W. 1097, 1098; Jackson Et Ux. v. Spellman, 55 Nev. 174, 28 P. (2d) 125; Lacher v. Venus, 177 Wis. 558, 188 N. W. 613; Gilmore v. Kitson, 165 Ind. 402, 74 N. E. 1083.

or surrender must be "clear and satisfactory,"[6] "clear and indubitable,"[7] "every intendment is in favor of the claim of the parent,"[8] and "parents are entitled to the benefit of every controverted fact."[9] The realism of the rule is reflected in the following language of the late Mr. Justice Cardozo in *Matter of Bistany, supra.* "To prevail they [the petitioners] must be able to show that even though the parents be given the benefit of every controverted fact, a finding of abandonment follows as an inference of law.

"Controversy, where there is any, being resolved in favor of the parents * * *.

"We are unable to yield to the petitioners' contention that the facts above recited point so decisively to an abandonment that every other inference must be held to be excluded."

In his dissent McLaughlin, J., adopted the thesis of the majority in the following language: "All disputed facts have been resolved in favor of the respondents [parents] and are binding upon this court." The *MacLean* case was decided before the *Bistany* case and neither the *Willing* nor *Munzel* case cites the *Bistany* case or discusses the rule of degree of proof there adopted.

To properly evaluate the evidence we should appreciate its background. These were not normal times. The period involved is from the middle of the year 1942 to February, 1946, when the petitions for adoption were filed. To war's alarms were added domestic misfortune, a wife and mother afflicted with an incurable disease, a sudden separation of the parents, disrupted family life, temporary residence of the children with relatives, importunities by these same

---

[6] Matter of Cozza, 163 Cal. 514, 126 Pac. 161, 165; Petition of Rice, 179 Wis. 531, 534, 192 N. W. 56.

[7] Matter of Petition of Kelly, 25 Cal. App. 651, 658, 145 Pac. 156.

[8] Matter of Petition of Kelly, supra.

[9] Matter of Bistany, 239 N. Y. 19, 145 N. E. 70.

relatives for their adoption actively encouraged by the wife, proceedings for divorce instituted by the wife accompanied by a controversy over the disposition of the children, the departure of the father from Honolulu to be with his divorced wife in New York, the return and death of the wife, and the husband apparently stunned and unable to adjust himself to the realities. From this father under these conditions normal reactions are not to be expected.

There was no voluntary surrender of these children to the care and custody of their aunts. Keeping in mind the legal incidents of "voluntary surrender" as that term is used in the statute, one need only consider the evidence of Mrs. Yee to the effect that she told Mr. Tom prior to his departure for the mainland in November, 1943, and after he had refused to permit the adoption of the children, that conditions could not continue as they were. This evidence absolutely negatives any bilateral arrangement from which it may be said that Mr. Tom surrendered the care and custody of the boy to Mrs. Yee and the girl to her sister Louise.

Nor can it be said that "a finding of abandonment follows as an inference of law" from the conduct of the father. Neither the petitions for adoption, the decision of the trial judge, nor the briefs of appellee in this court attempt to define any period as the specific period of abandonment of which the father was guilty. The evidence below covers a wide field—from the middle of the year 1942 to the date of the trial in August, 1946. It is a fielder's choice. No claim is made, however, that an abandonment occurred prior to departure of the father to the mainland on November 28, 1943. And I assume that petitioners rely upon some period of six months within the period from November 28, 1943, to February 13, 1946, when the petitions were filed.

The bases of petitioners' claims of the father's abandonment are (1) failure of the father to communicate with

the children or the persons who had their custody; (2) long disinterested absence; and (3) failure and neglect on the part of the father to make provision for the maintenance and education of his children.

Grounds (1) and (2) are considered together. Assuming, but not deciding, that the decree of divorce of November 12, 1943, is entitled to full faith and credit, the father's action must be judged by his legal status in relation to his children as fixed by the laws of Hawaii except as modified by the divorce decree. Under the laws of Hawaii the care and custody of minor children are committed to their natural parents jointly, that is, each of the parents has an equal voice in the matter. Reciprocally, the law imposes the duty upon the natural parents to support and maintain their children during the period of their minority. The right of care and custody was modified by the foreign divorce decree but not the obligation to maintain and support so that upon and after November 12, 1943, the care and custody of the two children were vested in the father with the right of visitation in the mother and their maintenance and support were imposed upon both.

It is undisputed that in September, 1943, upon the first return of Mrs. Tom from the mainland, both Mrs. Yee and her sister Louise importuned Mr. Tom for his consent to their adoption of the children, that Mrs. Tom urged and encouraged their adoption by her sisters and that Mr. Tom was adamant in his refusal, especially to the adoption of the little girl Patricia by Louise Loo. Under the circumstances it is understandable why the father did not write. Obviously the children were too young to write to personally. On the other hand, Mr. Tom testified that he did not write to his sisters-in-law because he did not want to renew the controversial question of adoption. Nor was it necessary to write to the aunts concerning their welfare. Mrs. Tom was in New York until July, 1945, and she re-

tailed to her ex-husband the news which she received from her sisters about the children. Parental love and devotion are not to be measured by articulation.

Nor are any adverse inferences to be drawn from Mr. Tom's long absence on the mainland. Whether his apparent lack of interest was the fact has already been pointed out. Mr. Tom left Honolulu in November, 1943, due to his wife's illness. Despite the divorce, she had his affectionate concern. The evidence is open to the inference that the divorce proceedings were instituted by the wife at the instance of her sisters for the specific purpose of her securing the sole custody of the children and thereby dispensing with the necessity of the father's consent to their adoption. The father circumvented this design by insisting that he would contest the divorce unless the custody of the children was awarded to him. Moreover, despite the divorce it appears that Mrs. Tom was in communication with her husband after she left for the mainland in September, that he awaited her establishment of a domiciliary residence in Nevada and upon receipt from her of a cable he left for the mainland. His evidence, quoted in the margin, is illuminating.[10]

Finally, as to the father's failure to make provision for

10 "Q Why did you go to the mainland? A On account of my wife leaving me. She has that serious operation. She had to have the breast removed. So I thought it was very serious." (tr. p. 40.) "Q Where did your wife live when she went up there to get her divorce, she lived in Reno? A She lived in Reno. Q Did you ever see her after she got a divorce? A Yes. Q In Reno? A No. In fact, she went to New York, where I left the same day. She left Reno, and I left [for] New York the same day. Q Now, just a minute. She was in Reno in November, 1943, when she got a divorce? A Yes. She left for New York, I think, in a few days or a week after. Then I left there about two days." (tr. p. 48.) "Q How long did your wife stay in New York? A A year and a half or two years. Q How often did you see her after your divorce? A Sometimes I see her often, sometimes I didn't. Q Once a month? A Sometimes; sometimes longer." (tr. p. 51.)

the support of his children. It is undisputed that due to the circumstances that precipitated its occasion, the arrangement by which the children originally became members of Dr. Yee's household was purely temporary and its duration was conditional upon the success of the medical treatment which Mrs. Tom sought abroad. Nor is it disputed that the terms or duration of the children's residence, at first jointly at Dr. Yee's home, and later, after September, 1943, separately, the boy with Dr. Yee and the girl with her aunt Louise Loo, were never defined. This evidence is fairly open to the inference that Dr. and Mrs. Yee took the children into their home and undertook their care gratuitously and not in consideration of any promise on the part of Mr. or Mrs. Tom, either express or implied, to pay any specific amount therefor or the reasonable value thereof. Both Dr. Yee and his wife were financially able to care for the children without contribution from their parents and the same may be said of Louise Loo in respect to her custody of the child Patricia. There is no question in my mind that had the father or the mother suggested payment for the care of the two children it would have been considered by the aunts as a gratuitous insult. The mere failure to contribute to the support of the minor children under the circumstances does not impress me. No demand was ever made by either Dr. or Mrs. Yee or by Louise Loo for contribution to their support and it was not expected.

Apparently his wife was this man's first concern and he remained in New York indefinitely on her account. Nothing occurred to occasion any concern about the children. They were enjoying the best of care. The same considerations that counseled placing them in the custody of his wife's sisters still obtained. His original intention to remain away from Honolulu for only three months, expressed to Mrs. Yee before he left, was submerged in his

consideration for his wife. Under the circumstances it is understandable that he allowed the care and custody of his children to remain in *status quo*. It is conceivable that despite the divorce, Mr. Tom paid his wife's expenses while the latter was in New York from November, 1943, to July, 1945, or at least contributed in a large measure thereto and welcomed the assistance afforded by the aunts' gratuitous maintenance of his children. Where the legal duty of a natural parent to support a minor child is gratuitously assumed by another to whom the care and custody of the child is temporarily transferred and such other performs such duty it certainly cannot be said that the acceptance by the parent of such performance by such other constitutes a failure on his or her part to perform his or her legal duty. No more so does it constitute willful abandonment. The father was no more guilty of abandonment than the mother. No one would have the hardihood to declare that upon and after November 12, 1943 (the date of the decree of divorce), the mother abandoned her children, or had she lived that she had forfeited her right to refuse consent to the adoptions. Of course, when his wife returned to Honolulu in July, 1945, and passed away the following September, he should have made an effort to adjust himself to realities, including provision for the personal care and custody of his children. But the worst term that can be reasonably applied to his actions is "neglect." His conduct, in my opinion, cannot be characterized as a willful abandonment. His excuses for his failure to return to Hawaii earlier, judged by hindsight, are obviously inadequate, but however inadequate they are not sufficient to sustain a finding of willful abandonment.