In the Matter of the Application of JOSEPH K. BISTANY and Another, Respondents, for the Adoption of ELLEN MATEJKA. JOSEPH MATEJKA and Another, Appellants.

Fourth Department, May 7, 1924.

**Parent and child — proceeding under Domestic Relations Law, art. 7, to adopt legitimate child alleged to have been abandoned by parents — abandonment, as used in Domestic Relations Law, § 111, subd. 3, defined — abandonment not shown.**

In order to sustain a finding that a legitimate child has been abandoned by its parents as the word is used in subdivision 3 of section 111 of the Domestic Relations Law authorizing its adoption without the consent of the parents, the evidence should at least warrant an inference that the parents at some point of time definitely dropped their parental interests, duties and obligations. The question is one of fact and the courts tend to exact a considerable degree of clearness and certainty in the proof of renunciation.

Abandonment is not shown in this proceeding by evidence that the child at the age of about two and one-half years was sent by her parents to her aunt who was housekeeper for the petitioners and remained with the petitioners from March, 1920, until the commencement of this proceeding in September, 1923; that the child's mother visited her at petitioners' home late in 1920 and occasionally sent gifts to her; that the petitioners took entire charge of the support, maintenance and education of the child with the apparent hope, supported by

conversations with the mother, that they would be permitted to adopt the child with the consent of the parents; that the mother at one time promised to send adoption papers to the petitioners, but failed so to do, and the petitioners did not press the matter; that while the petitioners are well-to-do people and the parents of the child are in poor circumstances, they are well able to care for the child in a proper manner, and that the original purpose in sending the child to the petitioners' home was to enable her to regain her health by living in the country after she had been ill with measles.

APPEAL by the defendants, Joseph Matejka and another, from an order of the county judge of Erie county, filed and entered in the office of the clerk of said county on the 8th day of October, 1923, allowing and confirming the adoption by petitioners of a child alleged to have been abandoned by her parents.

The opinion of the county judge is reported in *Matter of Bistany* (121 Misc. Rep. 540).

*Penney, Killeen & Nye* [*Olin T. Nye* of counsel], for the appellant.

*Timerman & Timerman* [*Clark H. Timerman* of counsel], for the respondents.

CROUCH, J.:

This is a proceeding under article 7 of the Domestic Relations Law, as amended, for the adoption of a legitimate child without the consent of its parents, upon the ground that the parents have abandoned the child. Upon the petition and the answering affidavits, a hearing was had and oral evidence was given for and against the application.

It was adjudged that the child had been abandoned by her parents; that their consent to adoption was unnecessary; that the moral and temporal interests of the child would be promoted by the adoption; and hence it was ordered that the adoption be allowed and confirmed, and that the child should henceforth be regarded and treated in all respects as the child of petitioners, and should be known under their name.

The primary question here is whether the parents "abandoned" the child within the meaning of subdivision 3 of section 111 of the Domestic Relations Law (as amd. by Laws of 1922, chap. 628), dispensing with the necessity of consent to adoption by a parent who has abandoned the child.

The statute itself does not define the word " abandoned." In some jurisdictions, under similar statutes, it has been held to mean no more than neglect or refusal to perform the natural and legal obligations of care and support which parents owe to their children. In others, it has been taken to mean to renounce and forsake entirely. (1 R. C. L. 609. And see note 30 L. R. A. [N. S.] 150; also 1 Supp. R. C. L. 212.)

We learn little on the point from the few cases decided under the adoption statute in this State or from decisions under other statutes in this State, where the word or a correlate thereof is used, as for instance, Penal Law, section 481; Code of Criminal Procedure, section 899; Civil Practice Act, section 1161, formerly Code of Civil Procedure, section 1762. Without attempting, therefore, to define sharply what constitutes abandonment under subdivision 3 of section 111 of the Domestic Relations Law (as amd. *supra*), we think, inasmuch as the fact seems to be intended as a substitute for consent, that the evidence should at least warrant an inference that the parents, at some point of time, definitely dropped their parental interests, duties and obligations. The question is one of fact, and, so strong are the ties of nature, the courts tend to exact a considerable degree of clearness and certainty in the proof of the renunciation. (*Matter of Johnston*, 76 Misc. Rep. 374; *Matter of Moore*, 72 id. 644; *People ex rel. Cornelius* v. *Callan*, 69 id. 187.)

For instances where the proof was held to be clear and sufficient, see *People ex rel. Lentino* v. *Feser* (195 App. Div. 90); *Matter of Hayford* (109 Misc. Rep. 479); *Matter of Larson* (31 Hun, 539).

Ellen Matejka, the child in question here, was born in New York city November 23, 1917. In March, 1920, Ellen, with the consent of her parents, went with her aunt, who was housekeeper for petitioners, from New York to petitioners' home, near Buffalo. There she has since remained. In the late fall of 1920 the child's mother came from New York, and remained at petitioners' home for three weeks on a visit. That was the only time either parent had seen the child since she left New York. The petitioners took entire charge of the support, maintenance and education of the child. The parents furnished nothing except some slight gifts. In the spring of 1923 the parents insisted that Ellen return to New York, and early in September the mother came to Buffalo to get her. This proceeding was then begun by the service on the mother of the notice and petition.

While all of the evidence has been carefully considered, it will be impossible to discuss it here in detail.

It is important, however, to understand the relation of the parties and the surrounding facts and circumstances. The petitioners are people of some means, in early middle age, residing in the town of Cheektowaga, near Buffalo, with a comfortable house and three acres of land. They have no children of their own. Mr. Bistany is in business in Buffalo.

Joseph Matejka and Susan Matejka, the parents of Ellen, were married in 1913. Joseph had been married before, and had two boys, approximately six and four years of age, by his former

marriage.   He was, and still is, an artisan, employed as an automobile upholsterer, earning at the time of the hearing sixty-five dollars a week.   Susan and her sister Mary had been servants in the employ of Mrs. Bistany prior to the time of her marriage to Mr. Bistany.   Mary has continued in the employ of Mrs. Bistany and is still with her.

Following their marriage, Joseph and Susan, with the two boys of Joseph, occupied a first floor apartment in a building on the East Side in New York, consisting of a store in front, with a living room, dining room, two bedrooms, a bathroom and a kitchen in the rear.   Susan carried on a grocery business in the store while her husband was working at his trade.   The child Ellen was born in November, 1917.   Following her at intervals of about two years, three children, all boys, were born.   In March, 1920, Susan's sister Mary, then, as now, in the employ of Mrs. Bistany, was on a visit in New York.   At that time Ellen, having had the measles several months before, was more or less ill and under nourished. There was a new baby six months old.   The mother had the store to look after and had to hire a woman for the household.   It was this situation which led to the child's going to Cheektowaga. Mary says that the father told her to take the child to Mrs. Bistany to keep and bring up.   The parents deny this, and say that their original purpose was merely to have the child kept in country surroundings for some months until she should fully recover her strength.   The weight of the evidence here is clearly against the petitioners.

On the occasion of the mother's visit to petitioners' home in November, 1920, there was some talk about adoption.   Whatever basis there may be for the claim of petitioners rests upon this talk, and upon the continued custody of the child thereafter by petitioners for upwards of two years.   Mrs. Bistany admits that down to this time neither parent had told her she could keep the baby.   No doubt the aunt, Mary, had led her to believe that she could, though she clearly understood that she had no legal claim.   It is admitted that in the course of the talk about adoption at that time the mother told Mrs. Bistany that she had made a will and had willed the child to her.   The mother's version is that she told Mrs. Bistany that she *would* will the child to her.   In either case, the inference is plain that the mother did not intend to surrender the child.   On the other hand, Mr. Bistany testifies he told the mother that if she had any thought of taking the child back, she should do it then; and that the mother said in substance that she was not going to take it.   Moreover, there is some evidence on

Fourth Department, May, 1924.    [Vol. 209

behalf of petitioners that the mother agreed to send back to them from New York " papers " for adoption.

Taking together all the evidence bearing upon this incident, it is not unfair to assume that the mother, in her own mind, knowing that the child was well kept and happy, desired an indefinite continuance of the situation; and that she was even willing, perhaps, to mislead the petitioners as to her real purpose. It is reasonably clear, however, that she did not wish and did not intend to give up the child. Her conduct, while understandable on the background furnished by all the evidence, was, of course, reprehensible. If she alone were concerned, it might be sufficient to warrant a holding of abandonment. But the father's rights are also involved. Whatever the mother may have said and done at that time could not bind the father. And we are to note what followed. No " papers " came. Nor did the petitioners further press for them. They were apparently content to let the indefinite status continue, realizing, perhaps, that any other course would lead to the immediate loss of the child. A year hence, at Christmas, 1921, the parents sent a little Christmas box to Ellen. In 1922 they sent her for her birthday a little pearl belt. And during this same period of time there were infrequent letters — three or four — exchanged between the mother and the aunt, Mary, in which inquiries concerning the baby were made by the mother, and in the replies to which the baby was said to send her " regards." Here, in the light of the failure to send adoption " papers," was sufficient warning that the parents had not given up the child. In the spring of 1923 the parents apparently determined that the time had come for the child to return. A letter to that effect was sent. Then followed a messenger to the petitioners in the person of another sister of the mother, making the same demand. The aunt Mary, representing petitioners, then went to New York and tried to adjust the matter. Then, in September, 1923, ten weeks after the birth of her latest baby, the mother herself went to Buffalo to get the child.

We think it is impossible, upon all the evidence, to hold that the parents " abandoned " the child. The result is a painful situation. The petitioners, with all the yearning that comes to childless people, have taken this little girl into their hearts and lives. The child herself has lost memory of and love for her parents. Those things must now be by them reawakened and called back. The pleasant surroundings and the material comforts of well-to-do people must be lost to the child in exchange for the life and living conditions in the crowded East Side district of New York. In one aspect these things are to be regretted. But, on the other hand,

the primal instincts and the natural and legal rights of the parents may not be lightly brushed aside. They are decent, respectable people, living in humble, but by no means unworthy conditions and circumstances for people of their station in life. The two older boys of the family are in high school and are receiving also a musical education. One may not say that this child, called upon under such conditions to struggle somewhat in her own behalf, will not develop into as strong and as good a woman as she would if she were left with the petitioners. Some degree of hardship, if hardship it may be called to live under the parental circumstances, is not necessarily to be deplored. In any event, in this proceeding, those matters are but remotely involved. Until the fact of abandonment has been proved, the petitioners can have no standing, and the comparative affluence of petitioners and parents may not be considered except as a circumstance bearing on the probabilities of that issue. (*Matter of Livingston,* 151 App. Div. 1.)

The order of adoption made by the county judge should be reversed and vacated, it being found as a fact that the parents had not abandoned the child.

All concur.

Order reversed and vacated, with costs, it being found as a fact that the parents had not abandoned the child.