In the Matter of the Adoption of Kay Verdeen Strauser and Betty Jane Strauser, by Russell T. Lucas and Mary A. Lucas,

*Petitioners and Respondents,*

vs.

Everett Buster Strauser,

*Applicant and Appellant.*

(No. 2387; August 17th, 1948; 196 Pac. (2d) 862)

For the Appellant the cause was submitted upon the brief and also oral argument of John F. Raper of Sheridan, Wyoming.

For the Respondents the cause was submitted upon the brief of H. Glenn Kinsley and James Munro, both

of Sheridan, Wyoming and oral argument by Mr. Kinsley.

## OPINION

KIMBALL, Justice.

This is an appeal by Everett Strauser, father of two minor children, from an order of approval of their adoption by Russell T. and Mary A. Lucas, husband and wife who, when not mentioned by name, will be called petitioners. Strauser will usually be referred to as the father or appellant. The order was made over the objection of the father whose consent was necessary unless he had abandoned the children. The question

to be decided on the appeal is the sufficiency of the evidence to support a finding of such abandonment.

The proceeding was initiated on a petition filed January 8, 1945, under section 58-202, C. S. 1945. The petition was set for hearing and the parents served by publication as provided by sections 58-206, 58-207, C. S. 1945. At the hearing, February 15, 1945, the parents failed to appear, and an order of adoption was entered, in which it was found that the "parents have wholly failed to support or provide for said minor children and have abandoned them and that is in the best interests of said children that they be adopted by the petitioners."

In April, 1947, the order of February 15, 1945, was opened on application of the father under section 3-3802, C. S. 1945, for the purpose of permitting him to file an answer and to be heard in opposition to the petition. The issue on the question of abandonment was framed by the petition, the father's answer and the petitioners' reply. There was attached to the reply a "counter-claim" for $2880, the alleged reasonable value of the support and maintenance of the children by petitioners from May 1, 1944 to May 1, 1947, and $150 alleged to have been spent by petitioners during that period for the children's medical care. The prayer of the reply was that the order of adoption of February 15, 1945, be confirmed, or, in the alternative, that petitioners have judgment on their counter-claim for $3030. The trial, April 29, 1947, resulted in a judgment confirming the order of adoption of February 15, 1945, on a finding that at the time of the entry of said order the children "had been and were then abandoned by their natural parents, Everett (Buster) Strauser and Alma Strauser, and that it was, and now is, in the best interest of said children that they be adopted" by petitioners.

The parents were married in March, 1938. The chil-

dren are girls, one born in November, 1938, the other in August, 1941. They were in the care and custody of one or both of their parents until March, 1943. The family home, and the domicile of the father at all material times, has been Great Falls, Montana, some 300 miles from Sheridan, Wyoming where this case arose.

The parents became separated near the end of the year 1942 when the mother left the home. In March, 1943, the mother brought the children to Sheridan and left them there with Mrs. Garom, their paternal grandmother. It may be assumed that by this transaction the children were abandoned by their mother who soon thereafter obtained a divorce and disappeared.

In February, 1943, the father "made arrangements" with his mother to care for the children, which she did until September, 1943. At that time the father, who had married a second time and "made a home", took the children back to Great Falls, where they remained with him and his second wife until the home was again broken up, this time by the death of the wife in February, 1944, after she had given birth to twins. The twins were placed in the care of their maternal grandparents and were still there at the time of trial.

In March, 1944, the two girls involved in the adoption proceeding, then aged, respectively, five and one-fourth and two and one-half years, were brought by their father to Sheridan and again placed in the care of Mrs. Garom. The father testified: "I had no place to take care of them up there and after my wife died I couldn't get anybody that was obtainable enough to look after them for me . . . . I came down at different times that summer and saw the girls and gave my mother money to buy clothing for them and whatever they needed, and I also bought goods for her to make clothes for each one. . . ." The grandmother, Mrs. Garom, testified: "He asked me to take care of the children.

He was broken up and had no place to take the children to, and I told him I would take the children and look after them. . . . He paid me as he had some."

The Lucases have two children of their own, boys, who when the adoption proceeding was commenced were aged 15 and 12. Mrs. Lucas testified that she likes all children and likes to have them in her home. She studies "as to their care and discipline and child psychology and all those things, and is interested in anything pertaining to children." At the time of trial there were seven children in the Lucas home, the two Lucas boys, the two Strauser girls, and three other children who were there in connection with the business, in which Mrs. Lucas was then engaged, of caring for children for pay.

Mrs. Garom and Mrs. Lucas have been intimate friends and neighbors for many years, visiting back and forth and doing favors for each other. While the Strauser children were in Sheridan, Mrs. Lucas saw them frequently and became fond of them. She often had them with her at her own home. It became a custom for her to take care of the children whenever Mrs. Garom was ill or was working away from her home. An incident of that kind seems to have been the first of the events that led the petitioners to assert that the children were abandoned by their father.

Mrs. Lucas testified that in May, 1944, Mrs. Garom's husband went to Washington to work, and "Mrs. Garom went out on a ranch to work. And she said she couldn't take the children along with her. She asked me if I would take them . . . I took them . . . She never asked to take them back."

The record does not show the date of Mrs. Garom's return to Sheridan, but she was there in a hospital for about ten days in the middle of October, 1944.

During that ten-day period, the father of the children came to Sheridan. He was then about 25 years of age, had been rejected for military service, was planning to go to Alaska to engage in what is referred to as "war defense work", and came to Sheridan to see if his mother would continue to care for the children while he was away. He saw his mother at the hospital and learned that the children were with the Lucases. He says that his mother told him the Lucases were to "keep the children a few days for her while she got feeling better."

In regard to the arrangement for the care of the children by Mrs. Garom while the father was in Alaska, he testified: "I told her I didn't know for sure where I was going or how long I would be gone, and when I got back I would pay her for what she had done for these children, for the care of them; that I wouldn't be back after them until I was situated to make a home for them and come and take them back." That was agreeable to Mrs. Garom, who said: "they could very well take care of them." Mrs. Garom testified that the father said, "If I couldn't take them he was going to take them back to Great Falls and get somebody to take care of them."

While in Sheridan, the father called at the Lucas home where he visited with the children, and had some conversation with the Lucases. Mrs. Lucas testified: "I said 'I can't take care of these children for nothing,' and he said 'I will start paying you after the first of the year.' That is all he said." Mr. Lucas testified that the father said, "Only that he would get in touch with us after the first of the year (1945), provide for their support." There was no discussion as to terms; Mr. Lucas "hadn't considered that." A fuller and somewhat different version of this conversation is given by the father. He testified that the Lucases said nothing about

adopting the children, or that they had the children "for good." "They wanted to know if it would be all right with me for them to take care of them. . . . I told them I wasn't leaving (the children) with them, I was leaving them with my mother, she was to look after them. . . . I recall that she (Mrs. Lucas) mentioned something about providing for them if she had to keep them, that she should get the same provisions I intended to give my mother, and I told her she would. . . . She wanted to know if she had to keep them if she would get anything from me for the support of them, and I told her she would if she had to keep them."

The latter part of November, 1944, the father went to Alaska, and stayed there working for construction companies for about nineteen months.

After Mrs. Garom in October, 1944, left the hospital, the children remained with the Lucases. In the following December, Mrs. Garom with her husband went to Superior, Wyoming, a coal mining town, where they expected to stay for an indefinite time (16 months as it turned out) while Mr. Garom worked in the mines. Before they left Sheridan the question arose as to the custody of the children while Mrs. Garom was at Superior. It was agreed that the children should be left at Sheridan with the Lucases. Mrs. Garom testified that the Lucases asked her to let them have the children. It was the older child's first school year and the Lucases "didn't want me to take her out of school . . . and didn't think it would be good for the girls to be separated . . . and I was to get both of them when school was out." Mrs. Lucas testified that Mrs. Garom "asked me if I would take care of the children. She didn't think Andy (Mr. Garom) would let her take them," and that it was Mrs. Garom who suggested that the older child should not be taken out of school.

Mrs. Garom testified that the Lucases often talked of

wanting to adopt the children, and that she (Mrs. Garom) had told them many times that the father "always objected to their being adopted whenever it was mentioned." This was denied by Mrs. Lucas, who testified, however, that she told Mrs. Garom that she had consulted about the children with the attorney who later represented the petitioners in the adoption proceeding. Mrs. Garom testified without contradiction that, just before she and her husband left for Superior in December, 1944, she called on the attorney and told him: "I didn't want any papers taken out without their father's consent; that if he consented, it was all right with me, if he consented to the children being adopted."

Shortly thereafter, January 8, 1945, while the father was at some unknown place in Alaska, and the grandmother at Superior which is some 350 miles from Sheridan by highways and considerably farther by rail, the adoption proceeding was started, and service made by publication as stated above.

There is vague evidence that Strauser's occupation before he went to Alaska was farm laborer, but nothing to show his earning capacity, or whether he had accumulated any property. In Alaska he earned wages of $115 to $145 a week. After he returned to Montana, the latter part of July, 1946, he did ranch work through the harvesting season, earning $15 a day. While so employed he met the woman who became his third wife. Shortly before the marriage, in October, 1946, he bought for $2500 a small restaurant in Great Falls which he and his wife operated until after the trial in this proceeding. He testified that he planned "to sell out the restaurant and buy a ranch", and during the argument of the appeal, counsel made a statement indicating that the plan had been carried out.

A strange fact in the case is that the father and grandmother of the children did not correspond with

each other. The grandmother did not know the exact whereabouts of the father while he was in Alaska, and until December, 1946, did not know that he had returned to Montana. The father, it seems, did not write letters to anybody. In explaining, he testified that his schooling ended at the sixth grade; he can write but he can't spell, and his reason, as he puts it, for not writing letters, is that "I just don't like to show too much of my ignorance, not being able to spell out my words."

On December 11, 1946, the father came to Sheridan to get the children. He testified: "After I got the (restaurant) business and got situated there, a place to live big enough to bring them (the children) to, and got to where I could get away from the restaurant for a few day, I came down (to Sheridan) to get them." He was then informed by his mother that the Lucases had adopted the children, a fact of which he had no previous knowledge. Thereafter he has been continuously active in trying to have the children restored to him by pressing his claim that their adoption should not have been approved without his consent.

Adoption is entirely statutory, and the proceedings must be conducted in substantial conformity with the provisions of the statute. See Nugent v. Powell, 4 Wyo. 173, 186-187, 33 Pac. 23, 20 L. R. A. 199, 62 A. S. R. 17 and In Re Cadwell's Estate, 26 Wyo. 412, 416, 186 Pac. 499, the only previous cases in which this court has had occasion to consider our adoption statutes.

The statutes controlling in this case have been in effect since territorial days. See §§ 2274 to 2286, R. S. 1887, which, with some supplementary provisions, are now §§ 58-201 to 58-216, C. S. 1945.

The proceeding in the case at bar is under section 58-202 which provides that:

"Any person may appear before the district court or the judge thereof of the county where he or she resides and offer to adopt any minor child as his or her own; provided, such minor and his or her parents if living, or guardian, if any, or county commissioners, as hereinafter provided, shall appear and consent to such adoption."

The next section (58-203) provides that where an offer is made and consent obtained, as provided in section 58-202, the court or judge, if satisfied as provided in section 58-201, shall make a like entry of record as therein specified, "with his approval of such adoption."

Section 58-201, referred to in section 58-203, authorizes a proceeding on the application of "any parent willing to relinquish all right to his or her minor child to any other person willing to adopt the same." If the judge, after due investigation, shall be satisfied "that the person making the application is entitled to make such relinquishment, and that the person proposing to adopt such child is a suitable person to assume the relation of parent, and that the consent of both parties to such adoption is mutual and voluntary," he shall enter of record "the fact of such application and consent, with his approval of such agreement and adoption."

Section 58-210 provides that in case a parent is a non-resident, "the written consent of such parent, properly acknowledged, shall be obtained and filed with the clerk of the district court, which shall have the same effect as if such parent were personally present and consented to such adoption."

The reference in section 58-202 to "county commissioners, as hereinafter provided," is explained by section 58-213, which, as originally enacted, applied only to the adoption of orphans, by providing: "Where both parents of any minor child are dead and there are no relatives of such minor known, or being unwilling to

take charge of and assume control of such child, the county commissioners of the proper county, upon information or otherwise, may provide for the adoption of such child in the same manner as the parent, if living, could under the provisions of this act." An amendment made the section applicable to abandoned children by providing:

"In any case of parents abandoning their children, without providing for their support and education, the county commissioners shall have the same authority to act as in case of the parent's (parents') death; provided, that if the residence of the parents is known the county commissioners shall notify them to take away or provide for their children, and if the parents do not claim such children within three (3) months after such notice is given, the county commissioners shall have authority to provide for the children's adoption as in case of the parents' death, . . .".

Section 58-204 provides, among other things, that on the approval of the adoption the parent "shall cease to have any control whatever over the person of such child so relinquished, or right to reclaim the same."

Section 58-202 requires that the "minor and his or her parents if living, or guardian, if any, or county commissioners, as hereinafter provided, shall appear and consent to such adoption," and section 58-210 provides that a non-resident parent need not "appear" if his or her written consent is obtained and filed. Section 58-202 is unique in failing to state the age or qualifications of the minor whose consent is required, but it is not contended that it was necessary to obtain the consent of the children involved in this proceeding, and we need not attempt a construction of that requirement of the law.

Though our statutes follow the pattern of the similar laws of practically all other states in requiring the consent of the parents, they do not contain a definite pro-

vision (common in most other laws) dispensing with the necessity of consent of a parent who has abandoned the child. However, in Nugent v. Powell, supra, in considering a proceeding under section 58-201, it was held that the "parent" who must relinquish the child under section 58-201, or consent to its adoption under section 58-210, is a parent who "still possesses a right to the care, custody or control of the child" (4 Wyo. at 188), and that such right could be, and had been in that case, lost by abandonment as shown by the evidence. In that case, the child, abandoned by her father, was in the care and custody of her mother who consented to the adoption.

When the reasoning in Nugent v. Powell is applied to this proceeding under section 58-202, it follows that the "parents" who must consent to the adoption are the parents who have not by abandonment lost the right to the care, custody and control of the children. It would not necessarily follow from anything decided in Nugent v. Powell that no consent is required in a proceeding under section 58-202 for the adoption of children abandoned by both parents and having no legal guardian. Under other adoption laws it is often provided that, when the parents' consent is unnecessary, consent of others must be obtained. See Vernier, Family Laws, § 259, p. 343; Note 104 A. L. R. 1464. Section 58-213, supra, applies to adoption of orphans and children abandoned by both parents, and appellant contends that in this case the adoption should not have been approved without the consent of the county commissioners. We do not reach this contention if we hold that the evidence is insufficient to show that the father had abandoned the children.

Consent lies at the foundation of statutes of adoption. Re Cozza, 163 Calif. 514, 126 Pac. 161, Ann. Cas. 1914A, 214; Re Lease, 99 Wash. 413, 169 Pac. 816. Our

statutes are especially clear on that point. In the routine case, the parties consent or agree, and the final act of the court or judge is called the "approval of such agreement and adoption" (§ 58-201), or refusal "to approve such adoption" (§ 58-205). The first duty of the judge is to see that the necessary consents are given. If they are not, the proceeding is at an end. There is nothing for the judge to approve. There is seldom any doubt as to the consent of the persons who offer to adopt the children, and the children often, as in the present case, are too young to be consulted. The important requirement is the consent of parents who have not abandoned the children. They speak not only for themselves but also for the children of whom they are the natural guardians.

When a parent refuses to consent, and the matter in controversy is whether he had abandoned the child so as to dispense with the necessity of his consent, the burden of proof is on the party seeking to justify the adoption on that ground, and the courts often say that the evidence to show abandonment must be clear and convincing. See Re Bistany, 209 App. Div. 286, 204 N. Y. Supp. 599; Re Kelly, 25 Cal. App. 651, 145 Pac. 156; Petition of Rice, 179 Wis. 531, 192 N. W. 56; Mastrovich v. Mavric, 66 S. Dak. 577, 287 N. W. 97.

It is important to observe the difference between a proceeding in which the court makes a provisional and temporary order for the custody of an infant, and an adoption proceeding in which the final order of approval will absolutely and permanently sever the natural relation between parent and child. In a custody case the welfare of the child under the then existing conditions may be controlling. See Harris vs. Muir, 24 Wyo. 213, 157 Pac. 26; Kennison v. Chokie ,55 Wyo. 421, 100 Pac. 2d 97. In an adoption proceeding in which it is necessary for the petitioners to prove that a parent has

abandoned the child, questions in regard to the fitness of the petitioners (§§ 58-201, 58-205) and the welfare of the child (§ 58-209) are not reached if abandonment is not proved. Re Cozza, supra; Re Lease, supra; Matter of Bistany, 239 N. Y. 19, 145 N. E. 70; Connelly v. Jones, 165 Md. 544, 170 Atl. 174; Re Anderson, 189 Minn. 85, 248 N. W. 657; Platt v. Moore, (Tex. Civ. App.) 183 S. W. 2d 682.

It was said in Winans v. Luppie, 47 N. J. Eq. 302, 20 Atl. 969, that abandonment in this connection imports "any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." That statement has been repeated in texts and many later cases. See Re Cohen's Adoption, 155 Misc. 202, 279 N. Y. Supp. 427, 433; Re Carlson's Adoption, 137 Neb. 402, 289 N. W. 764; Wright v. Fitzgibbons, 198 Miss. 471, 21 So. 2d, 709; Re Schwab's Adoption, 355 Pa. 534, 538, 542, 50 Atl. 2d, 504; People v. Bowdry, 324 Ill. App. 52, 57 N. E. 2d, 287; 1 Am. Jur. Adoption of Children, § 42; 2 C. J. S. Adoption of Children § 21 p. 388. Abandonment involves more than mere temporary absence or temporary neglect of parental duty. Re Snowball's Estate, 156 Calif. 240, 104 Pac. 444; Commonwealth v. Batyko, 157 Pa. Super. 389, 43 Atl. 2d, 364; Smith v. Smith (Ida.), 180 Pac. 2d, 853. In Re Bistany, 209 App. Div. 286, 204 N. Y. Supp. 599, the court, without attempting "to define sharply" what constitutes abandonment, thought, "inasmuch as the fact seems to be intended as a substitute for consent, that the evidence should at least warrant the inference that the parents, at some point of time, definitely dropped their parental interests, duties and obligations." Of course, a father of motherless young girls does not abandon them by merely leaving them in the care of others. That may be the natural and proper thing for him to do. See Re Kerns' Guardianship, 74

Calif. App. 2d, 862, 169 Pac. 2d, 975, 979; Re Baldwin's Guardianship, 130 Ore. 206, 278 Pac. 1078. In order that such a transaction may be held to work an abandonment there must be evidence from which it may be inferred that the parent did not intend to reserve the right to reclaim the children. See 2 C. J. S. Adoption of Children § 21, p. 388; Re Kerns' Guardianship, supra; Smith v. Smith (Ida.) 180 Pac. 853; Re Kelly, 25 Calif. App. 651, 145 Pac. 156.

We think the evidence is insufficient to justify the inference that the father abandoned the children. It was his duty to decide where the children were to be kept and cared for. See Biggs v. State, 13 Wyo. 94, 98, 77 Pac. 901. He did nothing wrong when he left them with Mrs. Garom who neither had, nor pretended to have, authority to relinquish any of her son's parental claims. In May, 1944, without the knowledge of the father, petitioners took the children in order to care for them while Mrs. Garom was working on a ranch. In the following December (1944) the children remained with the petitioners either on their request as Mrs. Garom testified, or on the request of Mrs. Garom according to the testimony of Mrs. Lucas. The children were with petitioners under that arrangement when, on January 8, 1945, they flled their offer to adopt, alleging that the children had been abandoned by their parents.

Petitioners had knowledge of facts that should have caused them to realize that the father had not abandoned the children. His visit to Sheridan in October, 1944, for the purpose of providing for the care of the children while he was absent from the States was an exercise of his right as the father and natural guardian, and a demonstration that he had no intention of abandonment. See Re Marks' Adoption, 159 Misc. 348, 287 N. Y. Supp. 800. There can be no doubt the petitioners

had notice that the father would not consent to an adoption, which was a warning that custody of the children by others was temporary and subject to parental rights. See Re Johnston, 76 Misc. 374, 137 N. Y. Supp. 92, Matter of Bistany, 239 N. Y. 19, 145 N. E. 70.

Petitioner's argument on the sufficiency of the evidence to prove abandonment is based on the fact that the father, though earning large wages, did not contribute anything to the support of the children or communicate about them with anyone for more than two years, that is, from October, 1944 to December, 1946. They attach no importance to the fact that a year and eleven months of that period was after the petitioners had offered to adopt the "abandoned" children.

Of course the failure of a parent to send money for the support of his children may in some circumstances be quite important on the issue of abandonment. See Nugent v. Powell, supra. It is of little or no importance if the persons in temporary care of the children are volunteers, who expect no assistance from the parent. See Re Kelley, 25 Cal. App. 651, 145 Pac. 156.

In the present case Mrs. Garom expected no more assistance than she received from her son. In the transactions between her and the Lucases there was not even a suggestion that the Lucases expected pay for their care of the children. The Lucases, as petitioners in the adoption proceeding, alleging abandonment before January 8, 1945, could not consistently claim that they expected money from the father after that date, and they gave no testimony of such an expectation.

We think the evidence relevant on the issue of abandonment fails to show conduct on the part of the father from which it can reasonably be inferred that it was his purpose to "forego all parental duties and

relinquish, all parental claims" to the children. A different conclusion is not warranted by the failure of the father to communicate with anyone about the children while he was in Alaska and for several months after he returned to Montana. This was a period when he had a right to believe the children were temporarily in good hands. His excuse for not writing letters, as stated above, may seem insufficient. His delinquency, if it be so characterized, was not the cause of harm to the children. It was not even the cause of petitioners' claim of abandonment. It was not misconduct for which he should be punished by having the children taken from him for adoption.

In the district court the father's motion to strike the counterclaim from the reply was overruled. We think the motion should have been sustained. We have found no authority indicating that money claims for the care of children have ever been litigated in adoption proceedings, although there are many cases in which it seems that such claims, if permissable, would have been urged. The code of civil procedure does not seem to authorize a counter-claim, except as contained in an answer. §§ 3-1309—3-1313. In habeas corpus and guardianship cases involving the custody of children it has been held that such claims are out of place. Harrison vs. Harker, 44 Utah 541, 560, 142 Pac. 716, 722; Guardianship of Bare, 170 Wis. 543, 549, 174 N. W. 906, 908; Note 116 A. L. R. 699.

The order appealed from will be reversed, and the case remanded with directions to enter an order refusing to approve the adoption, and dismissing the counter-claim without prejudice.

RINER, CH. J., and BLUME, J., concur.