Joseph PETERS and Lila Peters, Appellants
(Defendants below),

v.

James CAMPBELL, Appellee (Plaintiff below).

No. 2869.

Supreme Court of Wyoming.

Oct. 20, 1959.

345 Pac.2d. 234

494

Robert S. Lowe, Rawlins, for appellant.

Brimmer & Brimmer, Clarence A. Brimmer, Rawlins, for appellee.

Before BLUME, C. J., and PARKER and HARNS-BERGER, JJ.

496

## OPINION.

Mr. Chief Justice BLUME delivered the opinion of the court.

On May 5, 1956, plaintiff, James Campbell, filed in the District Court of Carbon County, Wyoming, his petition for a writ of habeas corpus alleging that he is

the father of an infant, Celeste Campbell, born to his wife on December 29, 1955, in Rapid City, South Dakota, and that the defendants, Joseph Peters and Lila Peters, unlawfully retained the possession of that child. On May 12, 1956, the court issued a writ of habeas corpus directing that the child be produced in court on May 25, 1956. On March 20, 1957, defendants filed their answer to the petition for a writ of habeas corpus, denying that the plaintiff was the father of the child in question and admitting that it is in their custody at Rawlins, Wyoming. They alleged that plaintiff and his wife abandoned the child and are not proper persons to have the care and custody of it; that defendants have paid out a considerable amount of money for the care and maintenance of the child; and that the writ of habeas corpus is sued out for the benefit of both plaintiff and his wife and that the latter, accordingly, should be made a party herein. Plaintiff, in his reply, denied all affirmative allegations.

In the meantime the defendants asked that plaintiff and his wife submit themselves to a blood test in order that their blood might be compared with the blood of the child Celeste. An order to that effect was made and the blood test was taken by Dr. Donald L. Becker of Casper, Wyoming, who also took a test of the blood of the child Celeste. The result of that test was, according to the testimony of Dr. Becker, that the plaintiff, James Campbell, was not excluded from being the father of the child Celeste.

The trial of this matter was had commencing on May 23, 1957. The trial court found that the plaintiff, James Campbell, was the father of the child, Celeste Campbell; that the plaintiff has never relinquished or abandoned the child and did not intend to abandon

his parental duties; and that plaintiff and his wife, Bette, are fit and proper persons to have the care and custody of the child, and by an amendment of the judgment found that it is to the best interest of the child that plaintiff and his wife have such care and custody. The court accordingly directed that the minor child be immediately delivered to the custody and care of the plaintiff, James Campbell. From that judgment the defendants have appealed.

On March 27, 1958, the court made an order staying execution of its judgment during the pendency of the proceedings in this court.

It may be mentioned herein that on June 16, 1956, the defendants herein filed in the District Court of Carbon County, Wyoming, a petition for the adoption of the minor child Celeste but no final order has been made therein.

The parties will be mentioned herein as they were in the court below.

The facts herein are as follows: The plaintiff, James Campbell, and his wife, Bette Campbell, were married on August 6, 1951. They had one child born in 1952 and another child born in 1954. Plaintiff is connected with the Air Force of the United States and is a staff sergeant and has been awarded a medal for distinguished service. Being connected with the Air Force required him to be absent from his usual home a good deal of the time and that fact caused some friction between him and his wife. Bette, who also had previously been connected with the Air Force, wanted to go to college while the plaintiff was away from home and she went to college in Kansas City, Missouri, in

the months of March and April 1955. At that time she met Ray Cardona, who was of Spanish descent, and, according to her testimony, she was intimate with him during the latter part of April and the early part of May 1955. She definitely discovered that she was pregnant in the latter part of June 1955 and, having had intercourse with Cardona later than the time that she had cohabitated with her husband, she concluded that any child that she would have would be the child of Ray Cardona and that it would be best that any child by Cardona should be adopted by some outside persons. To accomplish that fact she called upon the Reverend L. R. Buckman to find some suitable people who would undertake the care and custody of the child. She thought that the child would be born about February 1, the period of gestation being on the average 280 days. The child was born on December 29, 1955. On December 30, 1955, Bette Campbell signed a written relinquishment to the child and consented to the adoption of the child by others without any notice to her. The following statement appears, dated December 31, 1955:

"To Whom It May Concern:

"Permission is hereby granted to release the person of baby girl born to Mrs. James R. Campbell on December 29, 1955, to the custody of Lester Buckman.

"Signed:     Bette H. Campbell

"Signed:     Bette H. Campbell

"[signed]    James R. Campbell"

Mr. Buckman took charge of the child and delivered it to the defendants herein on January 6, 1956. According to the testimony of plaintiff and his wife, they

figured that in view of the fact that the child was born on December 29, 1955, it was born prematurely if considered as the child of Ray Cardona, but they discovered sometime in January 1956, through the Welfare Department, that the child was not born prematurely but weighed seven pounds and seven ounces and that it was accordingly a normal child. They concluded that the father of the child was James Campbell, the plaintiff herein, who, according to their testimony, was with his wife in Kansas City, Missouri, for the period of four days during the latter part of March 1955, so that the child was born within the period of gestation of approximately 280 days figured from the time that plaintiff and his wife cohabited as above mentioned. Plaintiff then called upon the Reverend Buckman to deliver the child to him and when he did not do so plaintiff brought an action against him in the Circuit Court of South Dakota for a writ of habeas corpus to obtain the custody and care of the child. A hearing was had in that connection on March 23, 1956. The court found that James Campbell was the father of the child but inasmuch as the child had been delivered to the defendants in this case by the Reverend Buckman, the write of habeas corpus was discharged. After that, on May 5, 1956, the present action was brought as already mentioned. During the trial Bette Campbell revoked her relinquishment to the child and her consent to its adoption.

Counsel for the defendants advances three propositions, namely, the following: Proposition 1: In the best interests of subject child she should be left in the home and custody of appellants; Proposition 2: Appellee has no interest in subject child by virtue of the fact that it was fathered by another, namely, Ray Cardona, and no consent of the waiver must be obtained

from appellee even though the child was conceived and born during wedlock, the evidence being sufficiently clear that the child was in fact illegitimate; Proposition 3: If subject child be deemed a legitimate child of appellee for any reason whatsoever, then appellee has lost all rights with respect to and in this child by virtue of abandonment.

1. In connection with Proposition 1 it is said that the father of the child does not have an absolute right to the care and custody of the child and that a court may award such custody to another if it is for the best interests of the child to do so. It is not necessary herein to question that statement of the law. In the case at bar the trial court found that is was for the best interests of the child that the care and custody of the child be returned to the plaintiff, James Campbell, the father of the child. There are no particular facts in the case which show that the judgment of the trial court in connection with this matter should be reversed.

2. We shall next consider Proposition 3 in which it is contended that the plaintiff and his wife abandoned the child and have therefore lost all rights to the care and custody thereof. The trial court on this proposition made the following statement:

"In this connection the evidence shows that for sometime before and after the birth of the minor child in question, his wife gave him the impression that he was not the father of the child. She convinced him that it would be better for all concerned to have someone adopt the child. He continued to feel that way until sometime in January 1956, when he found out from a Welfare Worker that the child was a normal baby and weighed over seven pounds. He immediately went to see

Rev. L. R. Buckman about the return of the child. In February of the same year he consulted with a Mr. Clapp, who was the attorney who represented the Peters in obtaining the relinquishment and consent to adoption from Mrs. Campbell. He was informed by Mr. Clapp that he could do nothing about getting the child back. He then consulted another attorney by the name of Gunderson. Shortly afterwards a Habeas Corpus proceeding for the return of said minor child was started by the Plaintiff in the Circuit Court of the Seventh Judicial Circuit Court of South Dakota. After a hearing on March 23rd, 1956, the South Dakota Court found that James Campbell was the father of said minor child; that the Rev. L. R. Buckman had surrendered said child to Joseph Peters and Lila Peters; that said child was in the State of Wyoming and that the Rev. Buckman had no control over said child at the time of the hearing. Accordingly, the Writ and the Rev. Buckman were discharged.

"Then in May, 1956, the present Writ was filed and proceedings to obtain the custody of said child have been in effect until this date.

"These facts, under the light of the present Wyoming decisions, would indicate to me that the Plaintiff did not abandon the said minor child. I feel that a fair interpretation of the evidence shows that the Plaintiff did not intend to abandon his parental duties and his parental claim to Celeste Campbell.

"In this case there is no evidence to show that Plaintiff is not a fit and proper person to have the custody of said child—the same can be said of the Defendants. I think it is fundamental that natural parents have a right to their own children and in order to deprive a parent of the custody of his child there must be grave reasons shown. These have not appeared in this case."

In order to constitute an abandonment of a minor child by a father, there must be an actual intent manifested to sever the parental relations. In re Guardianship of Bruegger, 94 Cal.App. 589, 271 P. 523. There must be a settled purpose to forego all parental duties and relinquish all parental claims to the child. In re Adoption of Strauser, 65 Wyo. 98, 196 P.2d 862. The plaintiff, according to his testimony, signed the paper heretofore set out permitting the Reverend Buckman to take the child out of the hospital under the mistaken belief that he was not the father of the child. As soon as he discovered his mistake and found that he was the father of the child in question here, he took every step that he could in order to get control and custody of the child. We cannot see that in view of such a fact it can be said that he abandoned it. We have not been cited to any authority that under the state of facts here presented a parent can be said to have abandoned his child. It may be that the court might have drawn an inference, even in spite of what we have said, that plaintiff actually abandoned the child. He was not required to draw such a conclusion. If two different inferences may be drawn from a state of facts, as we may assume was true in the case at bar, then the inference drawn by the trial court is controlling. Rienecker v. Lampman, 55 Wyo. 159, 96 P.2d 561, and see Johnston v. Vukelic, 67 Wyo. 1, 213 P.2d 925.

It is not necessary we think to discuss the relinquishment of the child on the part of the mother and we need not disagree with the able opinion of the Supreme Court of Utah in In re Adoption of D———, 122 Utah 525, 252 P.2d 223. The mother of the child could not bind its father by her relinquishment. The paper signed by the plaintiff in this case, as above men-

tioned, did not constitute a consent to the adoption of the child and in order that adoption be permitted the written consent of plaintiff, if he was the father, was required. Sections 1-712 and 1-709, W.S.1957 (§§ 58-204 and 58-206, W.C.S.1945). This consent was not required if he had abandoned the child. Section 1-719, W.S.1957 (§ 58-213, W.C.S.1945). Since the court has found that plaintiff did not abandon the child, the only question remaining in the case is as to whether or not he was actually the father of the child, so that we must turn to a discussion of that question.

3. The second proposition argued by counsel for the defendants is that the record shows that plaintiff in this case was not the father of the child Celeste. It is admitted herein that the child was born during the time that plaintiff and his wife Bette were married. Hence, a presumption of legitimacy arises. It is stated in 7 Am.Jur. Bastards § 14, p. 63, as follows:

"No principle of law is more firmly established than the principle that every child born in wedlock is presumed to be legitimate. It was a maxim of the Roman law, and one which the common law copied, that the presumption is that he is the father whom the marriage indicates, and Montesquieu, alluding to it, observed that 'the wickedness of mankind makes it necessary for the laws to suppose them better than they really are. Thus we judge that every child conceived in wedlock is legitimate, the law having a confidence in the mother as if she were chastity itself.' * * *"

In 10 C.J.S. Bastards § 3b, pp. 18-20, it is stated:

"The policy of the law is to confer legitimacy upon children born in wedlock when access of the husband at the time of conception was not impossible, and there is a presumption that a child so

born is the child of the husband and is legitimate, even though the wife was guilty of infidelity during the possible period of conception. In general, however, the presumption is not conclusive in the first instance and is rebuttable."

Referring to the fact that formerly the presumption was conclusive but that under the modern rule it is rebuttable, the text further states at pp. 21-22.

"* * * Even under the modern rule, however, the presumption is a strong one, one of the strongest and most persuasive known to the law, which means that, in addition to performing its essential function as a rule of evidence, the presumption, like the presumption of innocence, is accompanied by another rule fixing the required measure of proof, and there is authority for the view that it is well-nigh conclusive and that it becomes conclusive in the absence of any sufficient proof that the husband could not have been the father. * * *"

In this connection it may be mentioned that Dr. Bray testified that Bette Campbell told him that her last menstrual period was on April 5, 1955, and he concluded therefore that the child was not the child of the plaintiff herein but that of Ray Cardona, who was intimate with Bette during the latter part of April and the first part of May 1955. The court excluded the communication made to Dr. Bray on the part of Bette Campbell, and this is contended to be error. Section 1-139, W.S.1957 (§ 3-2602, W.C.S.1945) provides that:

"The following persons shall not testify in certain respects:

"1. * * * * a physician, concerning a communication made to him by his patient in that relation, or his advice to his patient * * *."

In construing an identical statute, it was held by the Supreme Court of Ohio in the case of Metropolitan Life Ins. Co. v. Howle, 68 Ohio St. 614, 68 N.E. 4, that the statute means what it says and that a physician cannot testify to a communication made to him by his patient. It is said in 97 C.J.S. Witnesses § 301a, p. 841, that:

> "The rule of privilege applies, although the patient is not a party to the action in which a disclosure is sought, and is not present to object. * * *"

It is admitted herein that Bette Campbell never gave permission to Dr. Bray to make any disclosure of what she told him, so that the ruling of the court herein was correct. We might, however, mention in that connection that the court stated, "I might add, that even if such testimony [of Dr. Bray] was allowed to stand it would not be strong enough to change the Court's findings in this matter", namely, in regard to the paternity of the plaintiff of the child Celeste.

The evidence herein, if believed, shows that the child Celeste was born, as stated before, during lawful wedlock. The plaintiff and his wife cohabited during four days in the latter part of March 1955. The child was born on December 29, 1955, and the period from the March cohabitation to the birth of the child on December 29, 1955, was the normal period of gestation, while the period from the latter part of April 1955 to December 29, 1955, was not. This evidence was amply sufficient to justify the court in finding that the child Celeste was legitimate, unless countervailing evidence was shown in the record that the plaintiff could not have been the father. Testimony to that effect was

sought to be introduced into the case, attempting to show that the child resembled Ray Cardona, who was supposedly Spanish. Objection was made to such testimony by counsel for the plaintiff. They claimed that such testimony was conjecture. We feel that they misconceived the law. It would have been advisable if a recess had been taken and the law on this matter had been fully elucidated when it was first introduced. A trial judge cannot be expected to know all the ramifications of the law, while counsel in the case look up the law in preparing the case with more or less care. The cases on the subject are innumerable. A full treatment is found in 7 Am.Jur. 649 et seq. Elaborate annotations are found in 40 A.L.R. 97 and 95 A.L.R. 314. The cases on the subject are hopelessly conflicting. It is said in 7 Am.Jur. Bastards § 32, p. 649:

"If the expressions of opinion in various cases are to be regarded as accurate, there is a decided conflict of the authorities as to the admissibility of evidence of resemblance as bearing on the question of legitimacy, the holding ranging from an unqualified admission of such evidence to a total exclusion thereof. * * *"

The point was considered to a considerable extent in the case of State v. Thomas, 38 Wyo. 72, 264 P. 1017, in which the court indicated that it did not favor introduction of such evidence, at least not in a criminal case. That case involved a child eight months old. The parents were of the same race so that the case perhaps cannot be considered any authority herein. We might mention in that connection that 1 Wigmore on Evidence, 3d Ed., § 166, p. 627, states as follows:

"* * * The sound rule is to admit the fact of similarity of specific traits, however presented, provided the child is in the opinion of the trial

Court old enough to possess settled features or other corporal indications."

The law appears to be somewhat different if color or racial characteristics are involved. It is said in 7 Am.Jur. Bastards § 34, p. 649:

"Generally, evidence that a child born during wedlock is of a different race or color than the mother's husband has been held to be admissible on the issue of legitimacy. This is true both of opinion evidence on the subject and of demonstrative evidence by exhibition of the child. * * *"

In 7 Am.Jur. Bastards § 50, p. 659, it is said:

"Evidence that a child is of a different race or color from that of its mother's husband is strong proof of illegitimacy unless it is explained by the child's resemblance in race or color to the mother. * * *"

1 Wigmore on Evidence, 3d Ed., § 167, p. 628, states on that point as follows:

"A physiological principle, similar to the preceding one, but attended usually with more clearly marked results, tells us that the progeny of persons of one race receive from the progenitors certain corporal traits very different from the traits transmitted from a progenitor of another *race*. The presence of these peculiar traits of the race is therefore evidential to show a progenitor of the race bearing those traits. The admissibility of this evidence has never been doubted by Courts; though its use, since the abolition of slavery in this country, is now very rare, because the issues in which it is relevant can only be uncommon."

It has been said that in such case the age of the child makes no difference. 7 Am.Jur. Bastards § 35, p. 650.

Clark v. Bradstreet, 80 Me. 454, 15 A. 56, 6 Am.St.Rep. 221. This should, of course, be true in clear cases as in cases involving a Negro child, mulatto child, a child of oriental features, Indian features, or, perhaps, Mexican. Whether that rule should apply in a case such as before us seems to be rather doubtful. In the case at bar the child involved was only seventeen months old at the time of the trial in this case. Whether it had fairly well-developed features is not shown in the record so that the case before us presents a doubtful question, especially in view of the strong presumption of legitimacy.

Assuming that it could properly have been shown that the racial characteristics of the child only seventeen months old were such as to prove that plaintiff could not have been its father, let us examine what the record herein shows. · The child was in the courtroom and so were the two legitimate children born in 1952 and in 1954 to plaintiff and his wife. At Question 248 on the cross-examination of the plaintiff by Mr. Lowe, plaintiff was asked, "You will consent, of course, to the Court seeing the children and comparing them with the baby in controversy?" The question was objected to as speculative. At Question 249 the plaintiff was asked, "Would you state for the benefit of the record a brief summary of the description of the two children that you have?" This too was objected to and the court sustained the objection. The court also stated, "I think the children were in the courtroom long enough for anybody to observe them." The answer to this question was doubtless intended to enable the court by way of comparison to say that the appearance of Celeste was different from that of the other children, but the question itself gave no indication that the latter's appearance was such as to show

that she might have been the child of Ray Cardona. The witness was merely asked to testify as to the appearance of the other two children, not as to the appearance of Celeste, so that if the question had been permitted to be answered this court would not know anything about the appearance of Celeste—only about the appearance of the other two children. At Question 492, on cross-examination of Bette Campbell, she was asked, "Would you please describe the appearance of Ray Cardona, please?" That was objected to as speculative and too remote. The court asked whether or not counsel wanted to make an offer of proof. Mr. Lowe therefore made the following statement:

"Well, the purpose, Your Honor, is again the connection of the established law; the right of the Court to take into consideration the appearance of the child in determining the question of paternity, or known paternity that relates directly, I submit, to the appearance of this child which has very obviously Spanish features, as did Mr. Cardona."

Thereupon Mr. Brimmer made the following statement:

"We won't agree and can never agree that this child obviously has Spanish features. I have noticed the child, I observed her closely today and my opinion is that she can fool many of us. Can you definitely think the law refers only to an obvious case, for instance; a white couple of a negro child, something like that. In this instance we submit that counsel's line of interrogation calls for evidence that certainly is not precise, it is indeed speculative, entirely too remote, it leads only to conjecture."

The court sustained the objection made by Mr. Brimmer.

The appearance of Ray Cardona, standing by itself, was immaterial. We surmise that counsel expected that if the answer should be that his appearance was Spanish, then the court seeing the child in the courtroom would conclude by way of comparison that Celeste was his child, but that is based on counsel's assertion that the features of the child were Spanish. That assertion was denied by counsel for the plaintiff and there is nothing in the record to show us the truth. So far as we can see, the foregoing question did not shed any light on the case insofar as this court is concerned. This case strongly shows the disadvantages under which this court labors at times as compared to the advantages which the trial court has.

At Question 682 on direct examination of Reverend Buckman by Mr. Lowe he was asked, "Now, Reverend, how does this child, Celeste Campbell, compare in appearance to their two other children?" An objection was made that the question was speculative and the court sustained the objection. The question probably implied that the children were different in appearance but that is all. Children of the same parents often are. The question hardly implies that the appearance of Celeste was such as to show Spanish features, let alone features which would show that the plaintiff could not have been the father of the child.

We think that all the foregoing questions should have been more specific or counsel should have followed the general rule and offered to show what he wanted to show, namely, that the child's features were such as to prove that she was the daughter of Ray Cardona and not the child of the plaintiff. In the absence thereof we are unable to say as to whether or not the trial court's rulings were erroneous. Tauer v. Williams,

69 Wyo. 388, 242 P.2d 518; Cooley v. Frank, 68 Wyo. 436, 235 P.2d 446; Wyoming Investment Co. v. Wax, 45 Wyo. 321, 18 P.2d 918; Casper Motor Co. v. Marquis, 31 Wyo. 115, 223 P. 764.

Aside from what has been said, we find affirmative evidence on the part of Dr. Becker that by reason of the blood test plaintiff was not excluded from being the father of the child Celeste. We further find that Bette Campbell testified that she had Spanish and Indian blood. We do not know whether or not her appearance indicates that inasmuch as we have not seen her and the record contains no evidence in that connection.

Counsel for defendants says that the court erred in not causing Bette Campbell to be made a party herein. We are unable to see how that would have prejudiced the defendants. She was probably a proper party but we cannot say that she was a necessary party.

Counsel claims that defendants should be reimbursed for the expenses which they incurred in connection with the child Celeste, and Mrs. Peters testified that she and her husband expended something over a thousand dollars in the care and custody of Celeste. The trial court considered that that question was not in the case at all. It is stated in 39 C.J.S. Habeas Corpus § 41a, p. 570:

"A proceeding in habeas corpus relating to the custody of a child must be viewed in two aspects. In one aspect, the writ purports to afford an inquiry into the question whether the child is unlawfully restrained of its liberty. In the other, it is ordinarily a means for investigating and determ-

ining which of two parties has the better right to, and is better qualified to have the custody of, a child. * * *"

We have not been cited to any cases where the contention of counsel for defendants has been held to be proper. In any event, defendants were early advised of the contention of the plaintiff and at least not later than the time of the commencement of this action. There is no testimony in the case as to what amount of money had been expended on the child by the defendants up to that time.

We do not find any reversible error in the record and the judgment must accordingly be and it is hereby affirmed.

Affirmed.